844

## In re BROWN.

### No. 2714.

Court of Civil Appeals of Texas.
Tenth Dist., Waco.

April 3, 1947.

Rehearing Denied May 8, 1947.

H. S. Beard, of Waco, for appellant.

Gene Maddin, Dist. Atty., of Waco, for appellee.

LESTER, Chief Justice.

This is an appeal from a judgment of the 74th Judicial District Court of McLennan County, Texas, acting in the capacity of a Juvenile Court, in which Leslie Brown, hereinafter referred to as appellant, was adjudged to be a delinquent child and his care and custody committed to the Gatesville State School for Boys at Gatesville, Texas. The complaint against him was filed on January 16, 1947, charging him with being a delinquent child for the following reason, to-wit: "That he violated a penal law of this state of the grade of felony in that he did on or about January 15, 1947, in the County of McLennan, State of Texas, voluntarily and with malice aforethought kill William E. Boyett by stabbing him with a knife."

The matter came on for hearing before the court on January 23, 1947. A jury being waived, the court proceeded to hear the testimony of approximately eighteen witnesses. At the conclusion of the evidence the court found Leslie to be a delinquent child and ordered that he be committed to the above school.

Appellee, through the District Attorney of McLennan County, Texas, has filed a motion in this court to dismiss this appeal, alleging in support thereof that this court has no jurisdiction in the matter for the reason that the appellant has not executed an appeal bond, or made an affidavit of his inability to do so in lieu thereof, as required by Texas Rules of Civil Procedure Nos. 354 and 355.

The statute under which appellant was charged and tried is Article 2338-1 of Vernon's Civil Statutes and provides in part as follows:

"Section 1. The purpose of this Act is to secure for each child under its jurisdiction such care, guidance and control, preferably in his own home, as will serve the child's welfare and the best interest of the state; and when such child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given him by his parents. * * *

"Sec. 2. This Act shall be liberally construed to accomplish the purpose herein sought. * * *

"Sec. 7. Any person may, and any peace officer shall, give to the Judge, County Attorney, or to the Probation Officer of the county, information in his possession that a child is within the provisions of this Act. Thereupon the Judge, the County Attorney or the Probation Officer shall make or have made, preliminary inquiry to determine whether the interests of the public or of the child require that further action be taken. If either the Judge or the County Attorney shall determine that formal jurisdiction should be acquired, the County Attorney shall prepare and file in the court, or any attorney may prepare and file in the court, a petition alleging briefly the facts which bring said child within the provisions of this Act, and stating: (1) the name, age and residence of the child; the names and residences, (2) of his parents, (3) of his legal guardian, if there be one; (4) of the person or persons having custody or control of the child; and (5) of the nearest known relative, if no parent or guardian can be found. If any of the facts herein required are not known by the petitioner, the petition shall so state. The proceedings shall be styled 'In the matter of————, a delinquent child.' * * *

"Sec. 13. The Judge may conduct the hearing in an informal manner and may adjourn the hearing from time to time. In

the hearing of any case the general public may be excluded. All cases involving children shall be heard separately and apart from the trial of cases against adults.

"If no jury is demanded, the Judge shall proceed with the hearing. When the proceeding is with a jury, the verdict shall state whether the juvenile is a 'delinquent child' within the meaning of this Act, and if the Judge or jury finds that the child is delinquent, or otherwise within the provisions of this Act, the Court may by order duly entered proceed as follows:

"(1) place the child on probation or under supervision in his own home or in the custody of a relative or other fit person, upon such terms as the court shall determine;

"(2) commit the child to a suitable public institution or agency, or to a suitable private institution or agency authorized to care for children; or to place them in suitable family homes or parental homes for an indeterminate period of time, not extending beyond the time the child shall reach the age of twenty-one (21) years;

"(3) make such further disposition as the court may deem to be for the best interest of the child, except as herein otherwise provided. * * *

"Sec. 21. An appeal may be taken by any party aggrieved to the Court of Civil Appeals, and the case may be carried to the Supreme Court by writ of error or upon certificate, as in other civil cases. Written notice of appeal shall be filed with the Juvenile Court within five (5) days after the entering of the order. An appeal, in the case of a child, shall not suspend the order of the Juvenile Court, nor shall it discharge the child from the custody of that court or of the person, institution or agency to whose care such child shall have been committed, unless that court shall so order. However, the appellate court may provide for a recognizance bond. If the appellate court does not dismiss the proceedings and discharge the child, it shall affirm or modify the order of the Juvenile Court and remand the child to the jurisdiction of the Juvenile Court for supervision and care, and thereafter the child shall be and remain under the jurisdiction of the Juvenile Court in the same manner as if such court had made said order without an appeal having been taken."

The legislature no doubt realized that in many instances the child proceeded against would be of tender years, and intended that such proceedings, in respect to his right of appeal, should not be encumbered by any hard and technical rules of procedure. The Act itself gives any party interested the right of appeal and makes no provision for an appeal bond or affidavit in lieu thereof, but says the Act shall be liberally construed. Considering the Act in its entirety and the purpose for which it was enacted, we do not believe that it was the intention of the legislature that a bond or affidavit in lieu thereof should be required as a prerequisite to his right of appeal. The motion to dismiss is therefore overruled.

Appellant sets out six grounds for reversal of the judgment of the trial court. On account of the importance of this case, all of his assignments will be fully presented and discussed.

Point No. 1 is: "Hearsay evidence was admitted by the court in the trial of this cause." The Act itself does not provide whether proceedings instituted thereunder should be governed by rules relating to civil or criminal procedure, but as said by the Supreme Court in the case of Dendy v. Wilson, 142 Tex. 460, 179 S.W.2d 269, 274, 275, 151 A.L.R. 1217:

"We think, however, that the whole Act discloses that the Legislature intended that proceedings instituted thereunder should be governed, as far as practicable, by the rules relating to civil procedure. * * * If the objects of the Act are to be accomplished, the proceedings thereunder must necessarily be civil in nature, and while in some respects the orders or the judgment of the court may have the characteristics of a judgment in a criminal case, the customary rules of evidence in civil cases, developed through long experience as essential in arriving at the truth with reasonable certainty, must be followed."

See also: Steed v. State, 143 Tex. 82, 183 S.W.2d 458.

The rule in respect to admitting inadmissible evidence in the trial of a case

in which there is no jury is that if there is sufficient evidence to support the court's judgment without the aid of such inadmissible testimony, unless the contrary is shown, it will be presumed that the court disregarded the same in rendering its judgment. Zetsche v. Lawler, Tex.Civ.App., 25 S.W.2d 907; International-G. N. R. Co. v. Shaw & Stumberg, Tex.Civ.App., 45 S.W. 2d 759; 41 T.J., p. 1246. There were no findings of fact or conclusions of law filed by the court, and none requested, but we find in the statement of facts, at the conclusion of the evidence introduced on appellant's motion for a new trial, these remarks of the court from the bench:

"In the trial of this case the court heard the testimony, and when the testimony of eye witnesses was finished, had there been no other testimony offered, the judgment of the court would have been the same as has been rendered, that is, that Leslie would have been adjudged a delinquent child. That was the judgment of the court. At a later date the child was sentenced by the court. Under the law, as I understand it, and under the testimony given, no other judgment could be reached except to say he was a delinquent child, and that he was to be put in the custody of the Gatesville Training School."

From the foregoing remarks we think the court, in effect, said that he did not consider any hearsay evidence in reaching his decision.

Point 2 complains of the court's action in hearing evidence about extraneous matters not charged in the complaint, and in connection with said point appellant complains of the testimony of Professor C. O. Callaway, Superintendent of South Junior High School, who was called as a witness and was permitted to give the following testimony:

"Q. From your observation of him and your association with him and the other people in that community, including the school children and the teachers, do you know his general reputation for being a peaceable, law-abiding boy? A. So far as his reputation in the community is concerned, I have never heard his name mentioned by any citizen of Waco, outside of the school room. He has lived within two blocks of me; he has never treated me with any discourtesy; in passing, he passed my house every day, and I have never heard any citizen mention his name. Now, his reputation at school was bad, not as a liar or thief, but he had a high temper, and he was in constant trouble with his teachers and with the superintendent, from the fact that he didn't control his temper, and was more or less disposed to be, I think, vicious. May I illustrate a sample or two?

"The Court: Go ahead.

"The Witness: On one occasion I was standing in the door of the recitation room in which he was present as a pupil in that class, the teacher was at her desk perhaps explaining some work to other pupils, and Leslie was standing up at the desk. He picked up a sticker, which had an iron base, and he picked it up and put it in her chair. She was bending over this way (indicating) and had she sat down on it— it was some six or seven inches long, and sharp as an ice pick, it was on the teacher's desk where she put slips of paper, so I rushed in and grabbed it out of the chair. He said he didn't intend to do any harm, and to my surprise the teacher said she knew he put it there. As I saw it, at that time, it looked like a total lack of good judgment. He had a great deal of trouble with that teacher, and I supposed perhaps he was putting it there for the purpose of doing her bodily harm; and on another occasion, a boy had an appendicitis operation, and I think it was his first day back at school. He passed the Brown boy and the Brown boy hit him, with his fist, right on that place where the doctor had cut out his appendix. After that I reported it to the Superintendent and asked that he be kept out of South Junior, and if he wouldn't I would like to take the matter before the School Board. He was transferred to North Junior. He had a violent temper, which he never sought to control, but he never told me a lie and never did steal anything that I know of. His reputation in that school was very bad, due to the fact he was always in trouble, and that trouble grew out of the fact he didn't control his temper."

Appellant also complains of the testimony given by W. L. Barron, a teacher in

South Junior High School, in which he testified in part as follows:

"Q. Do you know his general reputation there in the school for being a peaceable law-abiding boy? A. Well, I know his reputation in school. His conduct in school is bad."

Complaint is also made of the testimony of Mrs. Ruby Triplett, a teacher at North Junior High School, in which she testified as follows:

"Q. Just tell the court what impression you arrived at from that association? A. I have not taught Leslie in a class, but I have observed him in the halls and have come in contact with him in that way, and I feel that he is a boy of extremely high temper. I have not seen him doing anything particularly in school that was out of the way. I have felt myself, and I think I am speaking for the rest that knowing how he came to North Junior, with the understanding that he had to leave another school, everyone has done to the best of their ability what they could in dealing with him. I think they have not crossed him probably because they were aware of the situation.

"The Court: You are a home room teacher? A. Yes, sir, but I am not his home room teacher; Mrs. Collins is his home room teacher."

Appellant also complains of the testimony of E. D. Johnson, Superintendent of North Junior High School, a witness called by the State, who was permitted to give the following testimony:

"Q. Would you tell the court the circumstances of his enrolling there? A. As I remember the enrollment, I believe it was Mr. J. B. Brown, the Probation Officer, phoned me and talked to me about enrolling Leslie there, and said he had talked to some of the school authorities, and that Leslie had been in some trouble at South Junior, and thought maybe a new environment would be beneficial, and that for the good of the boy they wanted to move him to our school, and I agreed to it on the condition he would behave himself as he should.

"Q. What character of student has he made there? A. Do you mean from a standpoint of his grades?

"Q. No, sir, from the standpoint of his behavior? A. His behavior has been about the average; he has broken some of the rules; if you would like I can give you a few illustrations. He has not done anything seriously wrong.

"Q. From your observation of him have you drawn any conclusion from his demeanor as to his temper? A. He is positive, and although he has not displayed any temper before me, I think he probably has a temper.

"Q. Do you gain that from what you had heard spoken concerning it from all the other pupils and teachers in school? A. From hearsay. I have not noticed any display of his temper.

"Q. You might say he has a bad reputation? A. Yes."

The court knew that if Leslie was adjudged to be a delinquent child, it would be incumbent upon it to make some disposition of his care and custody; that is, to commit him to his parents or to some other person or institution, as the circumstances justified and required, viewed from the standpoint of what would be to the best interest of said child consistent with the welfare of society; and in performing such duties the court should have some knowledge of his history and other facts pertaining to the natural disposition and tendency of the child, in order to properly perform his duties in carrying out the provisions of said Act according to the purpose and spirit for which it was enacted. In delinquent cases the court is governed, as nearly as practicable, by the rules of civil procedure, in determining the issue of delinquency, and it is necessarily confined to the allegations of the complaint and should not consider the fact that the child had committed other and different offenses or acts of delinquency not alleged therein; but in deciding what should be done with a child in the event he should be adjudged to be a delinquent, it is proper for the court to have such facts, and where the case is tried before the court without the aid of a jury, we do not think it was error for the court to hear all pertinent facts in the same hearing. Of course, if the case had been tried before a jury, it would have been reversible

error to have admitted in evidence a great deal of the testimony that was admitted, because to admit testimony of extraneous matters would probably prejudice the jury against the child and cause them to find it to be a delinquent when they would not have done so if it had not been for such testimony. The only province of the jury in such cases is to pass upon the issue of delinquency. Dendy v. Wilson, 142 Tex. 460, 179 S.W.2d 269, 151 A.L.R. 1217; In re Hoskins, Tex.Civ.App., 198 S.W.2d 460, writ ref. Whether tried by a jury or by the court, if the child is found to be a delinquent then it is squarely up to the trial court to determine what disposition should be made of the child, and the Act gives the court broad discretionary powers in performing its duty in respect thereto. The trial court had the power to commit the child to his parents for any period of time it saw fit; it had the power to commit him to some other person, or it had the power to commit him to the State Home for Boys at Gatesville. Now, just because the court believed, and so decided, that Leslie should be subjected to more disciplinary control than he was receiving at home or would probably get elsewhere except in the State Home, and committed him to said institution, which order of commitment the court has the power, in the exercise of its discretion, to modify or revoke at any time, can it be successfully contended, in the face of all the facts in this case, that the court abused its discretionary power to such an extent that an appellate court should substitute its opinion in lieu of the trial court, whose duty and power it is, in the light of the record, to make such disposition? We think not. As heretofore said, unless it is shown to the contrary, the law presumes that the court, in rendering its judgment, disregarded all inadmissible evidence. The evidence concerning the history and disposition of the child was admissible in aid of the court in deciding what order should be made concerning the care and custody of said child in the event he was found to be a delinquent. The evidence being admissible on one feature of the case, it will be presumed that the court made the proper application of the same to the feature of the case for which it was admissible.

■ Appellant's point No. 3 is: "Appellant was not given a fair trial because the State's counsel developed the facts against appellant and wholly failed to bring out his defenses." Point No. 6 is: "Evidence of the severity of the attack on appellant and his action in self defense was not revealed to the court." These two assignments will be considered together. In order to show the character of examination made by the District Attorney and whether the facts were fully developed, it will be necessary to set out some of the questions propounded and the answers of the witnesses made in reply thereto. There were seven witnesses who were at the scene of the tragedy. We will take them up in the order in which they were placed upon the stand.

Witness Wendell Leggott, a boy sixteen years of age, testified as follows:

"Q. Did you know William Earl Boyett? A. Yes, sir.

"Q. How long had you known him? A. Ever since we were kids * * *

"Q. When did you next see him? A. When he came by on the scooter and picked me up.

"Q. Was he riding? A. Yes, sir.

"Q. What was he on? A. The motor scooter.

"Q. Do you know where he got it? A. He got it from Leslie, I think."

The witness testified about taking a ride on the motor scooter with William Boyett and that they returned within approximately forty-five minutes. He then testified:

"Q. When you drove up on the scooter beside Diamond's tell the court what happened? A. Leslie was waiting on the curb and when we pulled up he asked did we have fun on the scooter and Boyett said he did, and then Leslie hit him. Boyett stepped back and said 'wait until he got his coat off', and while he was taking it off Leslie hit him one or two more times, and when Boyett got his coat off he hit Leslie and knocked him down and they went to the ground and was fighting, with Boyett on top beating him in the face. About that time Boyett jumped up, holding his side and said 'Call an ambulance'. He walked in an opposite direction from me and said for

someone to call an ambulance. He then turned around and I saw the blood gushing from his side. Two boys got him and picked him up and brought him back to where they had been fighting and he lay there and died.

"Q. About how long did the fight last? A. I will say three minutes.

"Q. In your best opinion how long were they on the ground? A. About two minutes.

"Q. Prior to the time Boyett jumped up and left what was the position of the boys with relation to each other? A. Leslie had his foot in Boyett's stomach, trying to shove him off and Boyett had his left hand in his face, hitting him.

"Q. Were the boys more or less clinched and in close proximity with each other? A. Yes, sir. Boyett's knees were on the ground.

"Q. He was on top of the Brown boy? A. Yes, sir.

"Q. The boys were flush against each other? A. They were pretty close.

"Q. At the time the Boyett boy jumped up did he make any statement? A. He said 'Call the ambulance.'

"Q. When he jumped up did he leave the scene or what did he do? A. At the time he ran and ran behind a car over there.

"Q. About how far from where the Brown boy was was he lying? A. Ten or twelve feet.

"Q. It was then he said 'call an ambulance?' A. Yes, sir.

"Q. At that time did you observe any blood on him? A. Yes, sir, it was all around his shirt.

"Q. Did you see any knife or any instrument in the Boyett's boy's hand at any time? A. No, sir.

"Q. Did you see the knife at the time he was stabbed? A. No, sir, I didn't see it until after he jumped up; Leslie still had it in his hand.

"Q. When was the first time you saw any knife? A. When Leslie got up.

"Q. Who had the knife? A. Leslie had it.

"Q. Where was he holding it? A. In his right hand.

"Q. Just prior to the time the Boyett boy jumped up from off the top of the Brown boy did you see him fall forward in any manner? A. No, sir.

"Q. You didn't see him fall in any forward motion? A. No, sir.

"Q. The only injury you saw, as far as his body was concerned, was when he jumped up? A. Yes, sir.

"Q. Did you see him when he finally fell to the ground? A. No, sir, I was at his back.

"Q. Is this the knife you saw in Leslie's hand (exhibits knife to witness) A. Yes, sir.

"Q. Was he holding it? A. Something like this (indicating)."

The second witness was Kenneth Boen. After testifying he had been acquainted with Leslie and William for quite a while and was at the scene of the tragedy, he further testified:

"Q. When you got there tell the court what happened. A. I walked over there and parked my scooter and somebody told me there was a fight going to happen across the street, and I says, 'Who is it?' and they said they didn't know. I walked up there, and I was about twenty or thirty yards from them, and that is when I saw Leslie hit the boy, and then he tried to pull off his coat—

"Q. Who did? A. William; and he finally got it off and hit Leslie, and finally William knocked Leslie down on the ground and was hitting Leslie's head on the ground, and the next thing I saw William jumped up and said 'he stabbed me' and said to Leggott 'call an ambulance', and walked over there by a car and fell.

"Q. Then what did you do? A. I went over to see Leslie and then went over to where William was lying and asked him did he hurt him and he didn't say anything. Somebody else was around there and they began to pick him up, and we brought him around in the light where we could see.

"Q. Did you see any blood on William when he told Leggott to call the ambu-

lance? A. It was on his shirt, he had it open like that (indicating).

"Q. Did you ever see the knife? A. After they got up I saw the knife.

"Q. Who had it? A. Leslie.

"Q. What hand did he have it in? A. Right hand."

The third witness was T. L. Currie, who was present at the scene at the time, and who testified:

"Q. On that occasion did you see Leslie Brown? A. Yes, sir.

"Q. Did you see William Earl Boyett? A. Not at that time; I saw him later on.

"Q. Did you have a conversation with Leslie Brown on that occasion? A. Not exactly a conversation, he asked me if I had seen some boys drive off on a motor scooter, and I told him I had.

"Q. Where were you and where was Leslie? A. I was sitting in the car and he came up to the side of the car.

"Q. What did he ask you? A. He asked me if I had seen two boys, seen some boys ride off on a blue motor scooter, and I told him I had.

"Q. What did he say? A. He said 'That is what I thought' and he walked off. He said 'I have to get something to back myself up.'

"Q. Where did he go? A. He went around to the front, toward the front of Diamond's at that time."

The witness testified about the two boys coming back on the motor scooter, and he was asked:

"Q. Who was driving the motor scooter at that time? A. William Boyett.

"Q. Was there someone on the scooter with him, on the back end? A. There was another boy with him.

"Q. Did Leslie Brown come up about that time? A. Yes, sir, about that time.

"Q. Just tell the court exactly what you saw. A. Just as the scooter drove up I looked over and saw the two boys on the scooter, and I saw Leslie Brown go around and say something to the boy on the scooter, the Boyett boy, and Leslie hit him, hit the Boyett boy, the boy was about

half way on the scooter and about half way off, and when Leslie hit him the Boyett boy told him to let him get his coat off, Leslie hitting him during all the time he was trying to get his coat off, and finally he got his coat off and threw it in the face of Leslie Brown, and then stepped back and started fighting very vigorously with Leslie, and pretty soon they were on the ground. They got up once just for a second and then got back down on the ground. There was a lot of cursing and everything, and I was trying to get the tray off the car so I could go, because I didn't want to stand there and let my wife hear all that cursing, so I was taking the tray off, and as I took the tray off, they were down on the ground again, and it seems as though Leslie was trying to push the Boyett boy off of him, and the next minute the Boyett boy kinder hollered like and jumped up and ran, and ran past my car, going in a northerly direction, and then he turned, stopped and turned and raised up the front of his shirt and looked at his body, and I observed that there was a large amount of blood all over the front of his body. He said something—I was very nervous at that time, but he said something about 'you cut me, call the ambulance, call the ambulance.' He then walked over toward my car and just as he reached the back end of my car he fell against the car and then on to the ground. About that time I looked over and saw the Brown boy and he was standing there with a knife in his hand. By that time the Boyett boy had come over and fell against my car, the back end of it; he kinder leaned there a minute and then fell to the ground. Two boys picked up the Boyett boy and brought him around the back of my car, on the other side, and laid him down on the ground, and just then Mrs. Winningham came out of the door and asked him what he had done—

"Q. Asked who? A. Asked Leslie Brown what he had done, and he said something about cutting him, he ran off with my scooter, and he broke my hand. That is what he said. Then she said 'Why did you do it, why did you do it?' and that is what he said, 'He ran off with my scooter and broke my hand.'

"Q. I believe you testified Leslie Brown was trying to push the Boyett boy off of him? A. Yes, sir, it seems like that.

"Q. Could you demonstrate that? A. It looked like he was trying to push the Boyett boy off like that (illustrating).

"Q. Prior to the cutting the Brown boy was trying to push the Boyett boy off of him? A. Yes, sir."

Witness No. 4, Mrs. T. L. Currie, testified that she and her husband were parked at the hamburger stand waiting to be served hamburgers, and she was asked:

"Q. Did you hear a conversation which took place between your husband and Leslie Brown? A. Yes, sir.

"Q. Tell the court what that conversation was. A. Leslie Brown came over to the car and asked my husband if there was some boys that had drove off on a motor scooter and my husband said yes, and Leslie said 'that is what I thought' and then walked over to the front of Diamond's.

"Q. Did you hear any other statement or comment that he made at that time? A. I believe he said 'I will have to go to get something to back me up.' "

After testifying about the boys returning on the motor scooter, she was asked:

"Q. Did you see Leslie Brown at that time? A. Yes, sir.

"Q. Tell the court what happened. A. Leslie was talking to another boy on the curb and he walked up to this boy and I believe he said 'You ran off with my motor scooter, didn't you?' and I believe the Boyett boy said 'Yes', and then Leslie hit the Boyett boy in the mouth, and then they started fighting, and the Boyett boy was trying to get his coat off and the Brown boy kept hitting him, and when the Boyett boy got his coat off then they really got down to fighting. It didn't last but about three minutes, it wasn't very long; and they were down on the ground fighting, with the Boyett boy on top of the Brown boy and all of a sudden the Boyett boy jumped up and ran to the rear of our car and said, 'Why did you stab me?' I looked at him and about that time he lifted up his shirt and he was bloody from about the chest on down; there was blood on his trousers and everything; and about that time the Brown boy said 'Because you ran off with my motor scooter', and then about that time the Boyett boy fell over on the back of our car and somebody then ran over and grabbed him and laid him on the curb, to the left of our car—took him around our car and laid him on the curb, and about that time a Mrs. Winningham—I didn't know that was her name at the time, but later found it out—she came out of the door of Diamond's and asked the Brown boy why he did do it, and he said 'because he ran off with my motor scooter.'

"Q. Did you at any time ever see a knife or any other instrument in the Boyett boy's hand? A. No, sir.

"Q. Did you at any time see a knife in Leslie's hand? A. Yes, I did.

"Q. When did you first see that knife? A. When they brought the Boyett boy around and laid him on the ground; he was holding it in his hand.

"Q. Is this the knife you saw (exhibits knife to witness)? A. From where I was sitting I am sure it was."

Mrs. J. D. Winningham, witness No. 5, who was employed at the hamburger stand, testified that she was not present when the altercation took place but was out there immediately thereafter. She was asked:

"Q. When you stepped out of the door what did you see? A. I saw this little Currie boy sitting in a car, with a tray on the side; he had been served, and at that moment Junior Leslie ran up to the door, I will say about two or three feet from the door, and when I ran out of the door I ran to Junior and said, 'What did you do?'

"Q. At that time did you see the Boyett boy? A. No, they had not pulled him over from the side of the car then; then I looked and they were carrying him as Junior was talking. I says, 'Junior, what have you done' and he said 'I cut him, you damn right I cut him, and I would cut him again if he was standing up.' "

J. L. Baskin, a patrolman of the City of Waco, witness No. 6, testified:

"Q. When you reached the Diamond Hamburger Stand on that occasion tell the

court what you saw. A. I drove up there —a call came out that there was an emergency ambulance call—and when I got off my motorcycle Brown came out and met me and said 'I am the man you want to arrest.' I asked him what had happened and he told me, 'That Boyett boy stole my scooter and I cut him.' He said, 'We got into a fight, he had me down and was getting the best of me, and I managed to get my knife out of my pocket and cut him.' But that time I turned him over to the patrol car that drove up and went to the hospital."

Witness No. 7, J. W. Barnes, general manager of the Higginbotham-Harris Company, who was at the hamburger stand at the time in question, was examined as follows:

"Q. What did you hear? A. Mr. Wright was to my right and I was standing there, I had my car parked along beside the side entrance, and I heard this car hop lady say 'Why in the world did you do it' and he said 'He got my scooter, and I would do it again.' ·

"Q. That is all you heard? A. Yes, sir, that is all."

After the court warned Leslie, he took the stand and made the following statement:

"Leslie Brown: The Boyett boy had run off with my scooter all the time, and riding it, and I was all the time having to have it fixed. He had run off with it before, but I had no hard feelings against him.

"Mr. Maddin: Q. You say he had run off with it before? A. Yes, it had happened two or three times before. I had been carrying the boys wherever they wanted to go every afternoon, and at that time I was fixing to go home, so when I went out to the scooter it wasn't there. I waited around a little bit and then William came back, and we started fighting. I didn't intend to hurt him, because when I was trying to get the knife I could have kicked him below the belt, I had on boots; I didn't intend to hurt him or anything. I don't know exactly how I pulled the knife out; I was just going to put it in his side to make him let me up, and I didn't think I shoved on it; in fact, I don't know how

it happened, it happened so fast. I didn't intend to hurt the boy.

"Q. Where did you get the knife? A. I got it from Red Blassingame.

"Q. Didn't you ask him for the knife and he refused to let you have it the first time? A. Yes, sir, I was kinder pulling on it, pulling it out of his hand. I slipped it out of his hand and I said, 'I might get into trouble with it,' and I, slipped it back, and when I said that he said 'I am not going to let you have it, you might get into trouble.' I went on the outside and asked this boy T. L., whatever his name is, that lives on North 4th if two boys went off on my scooter, and he said 'Yes', and I said 'I guess I had better get something to back me up' and I went back in there and got the knife, but I didn't have any intention of using it to hurt anybody, I was going to scare them with it.

"Q. When you say he was on top of you, you got the knife out, and you say you just meant to stick him enough to get him off of you? A. No, sir, I didn't mean to stick him at all; I meant to show him the knife and put it to his side to let me up; he had me by the hair of the head and had me on the ground beating me up with his fists all the time.

"Q. Did you tell Mrs. Winningham you were just going to stick him enough to make him get off of you, and when you shoved the knife into his body it went in like hot butter? A. Yes, sir, I think so. I don't know how I got the knife out, I had it in here and I had on tight jeans.

"Q. You never did see a knife or any other instrument in Boyett's hand, did you? A. I thought he borrowed something or had on a ring or something like that.

"Q. You say he had a ring on his hand? A. Someone said he had a ring on his hand and slung it off when he hit me; I don't know how it was.

"Q. You never did see any instrument in his hand, did you? A. No, sir. I didn't have any intention of using the knife at all but he had me down and said I would never get up, said a curse word and said 'You are not going to get up' and that is when I pulled the knife to scare him off of me.

"Q. How did you get the knife out of your pocket? A. I had it down like this (indicating) and I stretched back like this (indicating) and got it.

"Q. Got it with your right hand? A. Yes, sir.

"Q. When you got it with your right hand did you shove it up against him? A. Yes, sir, to his side, and that is when it happened.

"Q. Up to that time you were trying to push him off with your left hand, trying to get him off of you? A. Yes, sir, he was beating me up."

The foregoing is a fair sample of the manner and form of the questions propounded by the District Attorney to all the witnesses who testified in this case. It seems to us that he developed the facts fully and in a fair and impartial manner, including the evidence in relation to Leslie's right of self defense; that he exhibited no prejudice or ill will toward Leslie nor attempted to take any undue advantage of him during his trial. It is not contended that he failed to have in court any material witness that was present at the scene on the unfortunate occasion in question. It is true that there was no testimony on the main hearing that Leslie received a black eye and a knot on his head, but those facts were fully developed in appellant's motion for a new trial, and the court, after hearing said facts, evidently was of the opinion that a correct decision had been reached in the matter and overruled the motion.

Appellant's fourth point is: "The court did not guard the rights of appellant and see that no advantage was taken over him in this trial." We realize that it is the duty of the court to zealously guard the rights of a child brought before it charged with being a delinquent, and if it has failed in that respect and the child has suffered any injury as a result thereof, then the case should be sent back for further proceeding. In order to present a fair picture of the trial judge's conduct and attitude during the trial of the case, we will quote from the record. When all parties appeared for trial the following proceedings occurred.

"The Court: Are you ready to proceed?

"Mr. Maddin: Yes, your Honor. At this time we wish to submit the petition and affidavits.

"The Court: Before we start I want to caution each one not to make any demonstration at all. I understand your feeling in the matter, but the court will not permit any demonstration by anybody. Mr. Brown, (addressing Leslie's father) do you have counsel to represent you in this matter?

"Mr. Brown: No, sir.

"Mrs. Brown: We are willing for you (the court) to hear the case.

"The Court: Do you waive a jury?

"Mrs. Brown: Yes, sir; we are willing for you to pass on the case.

"The Court: Who is the first witness?"

Then Mr. Gordon Connally, the undertaker, was called. At the conclusion of his testimony the court asked: "Does anyone have any question to ask; do you wish to ask any questions, Mr. Brown?" Mr. Brown answerd: "No, sir." At the conclusion of the testimony of Wendell Leggott, the second witness, the court asked: "Does anyone wish to ask this witness any further questions, either you, Mr. or Mrs. Brown?" Mr. and Mrs. Brown answered "No." At the conclusion of the testimony of the third witness, Kenneth Boen, the court asked: "Do you wish to ask any questions, Mr. Brown?" And Mrs. Brown propounded a question to the witness. At the conclusion of the testimony of the witness T. L. Currie the court asked: "Does anyone wish to ask any questions?" Mr. Brown replied: "I would like to ask him a question," and the question was propounded by Mrs. L. V. Brown, mother of Leslie. At the conclusion of the testimony of the next witness, Mrs. T. L. Currie, the court asked: "Does anyone wish to ask any question?" At the conclusion of the testimony of Mrs. Hewitt the court asked: "Any questions by anybody?" At the conclusion of the testimony of J. W. Barnes the court asked: "Anybody want to ask any questions?" At the conclusion of the testimony of Professor C. O. Callaway the court asked: "Has anyone else any statement to

make or question to ask; if not, we will proceed with the other witnesses." At the conclusion of the testimony of W. L. Barron the court asked: "Do you have any statement to make (addressing Leslie), whereupon Leslie gave his views of what transpired at South Junior between himself and his teachers and the boy who had been operated on for appendicitis. At the conclusion of the testimony of Mrs. Ruby Triplett the court asked: "Anyone wish to ask any questions?" So it can be seen that the court gave all interested parties an opportunity to ask any questions they saw fit, and the parents of Leslie did avail themselves of that privilege and cross-examined several of the witnesses.

Before Leslie Brown was permitted to testify the court addressed the following remarks to him:

"Leslie, do you want to make a statement? If you do, before you make it, I want to advise you that you have a right to make a statement if you want to and if you don't want to you don't have to make a statement, but that if you do make a statement, any statement you make can be used either for or against you. If you want to make a statement, all right, if you don't want to make one you don't have to make one. Is there any statement you would like to make relative to this case, bearing in mind it could be used either for or against you?"

At the conclusion of Leslie's testimony the court asked Mr. Brown, the father: "Mr. Brown, do you have any statement that you want to make?" Mr. Brown answered: "I believe not." The court asked Mrs. Brown: "Do you have a statement you wish to make?" And Mrs. Brown made a statement. At the conclusion of her statement the court asked: "Have you any witnesses you want to call?" Mrs. Brown answered: "I didn't bring any witnesses, other than my husband's sister; we thought it was going to be informal like this." The court asked: "Is there anyone here that wants to make a statement?" A lady in the audience by the name of Mrs. Gouldsby informed the court that she wanted to testify, and she stated that she had known Leslie's mother and father all of her life and knew

that they had tried to raise him right and that she knew Leslie had always been a very obedient boy. The parents exercised their privilege in cross-examining several of the witnesses. The record does not reflect that they requested that any additional witness be summoned.

We believe that the foregoing demonstrates without question that the court was conscious at all times of the rights of the appellant and that it did everything within reason to guard his rights. We therefore think that said point is without merit.

Appellant's fifth point is: "Appellant was not given a fair trial because he was advised by the complaining witness, J. B. Brown, Jr., not to employ an attorney and then advised with the court when the court gave the appellant the maximum punishment permitted by law." On motion for a new trial Mrs. Brown, the mother of Leslie, testified that she went to J. B. Brown, Jr., Probation Officer, to advise with him as to whether they should take a jury and have counsel to represent Leslie in this case; that he advised her that they had a right to a jury and counsel but that if it was his son he would leave it to the judge, as he thought the judge would be more lenient with him than a jury and that an attorney might cross the witnesses up and might agitate the judge and it might be better not to have an attorney; that based upon that advice they did not take a jury nor employ counsel in behalf of Leslie. J. B. Brown, Jr., testified that he did the very best he could to instruct the family as to their rights; that he told them they had a right to a trial by jury and had a right to be represented by an attorney; that this case was a serious thing and that he could not tell them what the outcome would be, that would all depend on the evidence, but he felt like the court would take into consideration all the evidence that was presented and certainly the court would be fair; that in these kind of cases there are two main problems, one is the protection of the child involved and the other is the protection of society from any involvement the child might be in. He further testified emphatically that he did not represent to the parents or advise them that if this was his

boy that he would not employ an attorney, and that he did not recommend or suggest to them that they not employ an attorney.

 It is the duty of the Probation Officer to guard and protect the rights of the child proceeded against, and he should never encourage or advise a child or those interested in its welfare not to employ counsel on a pretense that it might irritate the court, but he should, especially where the charge is a serious one, encourage rather than discourage the employment of counsel to take care of the rights of the child. The court did not file findings of fact or conclusions of law on the issues developed on appellant's motion for new trial, and none were requested, but if the court had done so and found that the Probation Officer did make the representations as contended by Mrs. Brown, or if the evidence was without despute, then an entirely different question would be raised, and a most serious one. The testimony of Mrs. L. V. Brown and the Probation Officer creates a very sharply drawn issue of fact. The action being civil in nature, the court, in overruling appellant's motion for a new trial, is presumed to have found adversely to appellant on such issue, and such finding on the part of the trial court, when based upon sufficient evidence, is binding upon this court.

We have extended this opinion to a great length in order to reflect all of the important facts. The Act itself is practically new and is uncertain in many respects and possessed of many other imperfections, but it is the only law pertaining to the trial of juvenile delinquents in this state as all other laws were repealed by said Act. This Act has been before the appellate courts only in the following cases: In re Dendy, Tex.Civ.App., 175 S.W.2d 297; Dendy v. Wilson, 142 Tex. 460, 179 S.W.2d 269, 151 A.L.R. 1217; Steed v. State, 143 Tex. 82, 183 S.W.2d 458; Ballard v. State, Tex.Civ. App., 192 S.W.2d 329; In re Hoskins, Tex. Civ.App., 198 S.W.2d 460, writ refused.

Finding no reversible error in the proceedings below, the judgment of the trial court is affirmed.