Saul S. Street, J.
Judgment of separation entered after a trial before this court has been modified by the Appellate Division (2 A D 2d 744) “ to the extent only of remitting *84 same to the Justice who tried the action * * * for the purpose of utilizing the services” of “a trained social worker ” “ as an aid in deciding the custody of the six-year-old son of the parties ’ ’. A motion to amend the support and maintenance provisions of the judgment has likewise been remitted ‘ ‘ to await the decision as to custody of the afore-mentioned son ’ \ [Motion for leave to appeal denied 2 A D 2d 817; motion dismissed 2 N Y 2d 780.]
Pursuant to the remittitur, this court designated a social worker, recommended by the Association of the Bar of the City of New York, to make an investigation and report. After receipt of the report, the court conducted hearings, in which counsel participated, at which the parties and witnesses were examined, and, in addition, the court interviewed Fran, the daughter, and Lewis, the (now) seven-year-old boy, whose custody is to be determined. .The report consists of a series of interviews with the parents, the children, and others. It is only “ an aid ” to the court and cannot become part of the record or form the basis for a decree. (Cf. People ex rel. Kessler v. Cotter, 285 App. Div. 206; People ex rel. Handler v. Handler, 282 App. Div. 694.) The social worker is not an officer of the court. It would not be feasible to have her sworn or subjected to cross-examination. Even if this were done, most of her testimony would constitute hearsay, consisting of her version of what others said to her. Although the investigator’s reactions and views are entitled to the court’s consideration for the purpose of assisting the court in arriving at its determination, the ultimate decision must be made by the court itself, not by the unofficial investigator. Otherwise the court would be abdicating its legal duty as an officer of the State judicial system. The report of the social worker was, however, given careful study and consideration by the court, and its contents formed the basis of questions put by the court to witnesses at the hearings held after the filing of the report.
Were it not for the fact that the plaintiff is a member of the Christian Science Church and the bearing such membership has upon the possibility that Lewis may not receive necessary medical attention and care if his custody is entrusted to plaintiff, there would be no question in the court’s opinion, but that she should be awarded the boy’s custody. Lewis is only seven years old. In the absence of exceptional circumstances, the mother, if she is a proper person, able to discharge her duty to the child, is entitled to the custody of an infant of that age. (People ex rel. Sinclair v. Sinclair, 91 App. Div. 322, 325; People ex rel. MacAlpine v. MacAlpine, 50 N. Y. S. 2d 232 [Shientag. J.].) This *85 is all the more true in view of the fact that the plaintiff was the innocent party to the breakup of the marriage, the decree of separation having been granted to her because of repeated assaults upon her by defendant and the latter’s unjustified abandonment of her. As the Court of Appeals said in Harrington v. Harrington (290 N. Y. 126, 130): “Apportionment between the parents of the blame for the broken marriage may not be the decisive factor in the determination [of custody]. (People ex rel. Herzog v. Morgan, 287 N. Y. 317.) Nonetheless, the past conduct of the parents, the unwillingness of one or both to carry out their marital obligations are factors which may not be disregarded in determining which parent will provide the better home.”
If the custody of Lewis were given to his father, he would see very little of that parent and would enjoy the companionship and parental guidance of his mother only on days of visitation. The defendant leaves home for business at varying times between 7:30 a.m. and 9:30 a.m. and returns at varying times between 5:00 p.m. and 8:00 p.m. In addition, the defendant makes frequent trips which absent him from home for periods of three to five days. During his absences, both on business days and on said trips, the only adult companionship and guidance Lewis would receive would be that of the maid and, occasionally, that of defendant’s sister and brother-in-law. On the other hand, were Lewis entrusted to the custody of the plaintiff, he would enjoy the companionship, care and parental guidance normally received by a child of his age. Although the present home of plaintiff is not all that it might be from a physical standpoint, this situation is only temporary and is due entirely to defendant’s willful failure to pay plaintiff the amount required by the decree of this court. The boy himself told the court that he enjoyed living with his mother and always had “ a lot of fun ” with her and that he did not miss his father much, and prefers to live with his mother. The plaintiff is a refined and cultured person and appears to be devoted to Lewis.
Under these circumstances, it seems clear that the only doubt as to the suitability of the plaintiff to be entrusted with the custody of Lewis is created by the fact that she is a member of the Christian Science Church and, as a believer in its doctrines, might fail to furnish necessary medical or surgical care to Lewis in the event of his illness. This is what the Appellate Division appears to have had in mind when it referred, in its opinion, to ‘ ‘ the doubts that evidently troubled Special Term, and that trouble this court.” The court, at the trial, had interrogated *86 plaintiff as to whether she would call a doctor if her child were ill and had directed, in the decree of separation, that she cause Lewis to be examined at least once a month by a physician and that she be guided solely by the latter’s advice as to medical treatment that might be required.
Before taking up the question of the plaintiff’s attitude toward healing by medicine or surgery, it might be well to point out that the mere fact that plaintiff’s religion is Christian Science does not ipso facto disqualify her from the right to custody of her infant child. If mere membership in that church were a ground of disqualification, the Appellate Division could, and presumably would, have so decided without remitting the question of custody for further investigation. Mor does the fact that awarding custody to the plaintiff may result in the child’s being educated according to the tenets of the Christian Science Church affect the right which she would otherwise have to its custody. In Weinberger v. Van Hessen (260 M. Y. 294, 298), the court said: ‘1 While the court will not take the question of a child’s religious education into its own hands, short óf circumstances amounting to unfitness of the custodian, it must on occasion decree partial custody, including the right of religious education according to the views of the custodian.” In Matter of Kananack (272 App. Div. 783, 784), it was held that “the court * * * will not take the question of a child’s religious education into its own hands short of circumstances amounting to unfitness of the custodian (Weinberger v. Van Hessen, supra), and in a dispute relating to custody, religious views afford no grounds for depriving a parent of custody who is otherwise qualified. (Denton v. James, 107 Kan. 729.) ” (See, also, 29 Harv. L. Rev. 485, where, referring to the English law that the father had the right to choose in what religion his child should be educated unless by his acts he forfeited, abandoned or waived that right, the statement is made [p. 497] that “In the United States the constitutional limitations against any established religion have fortunately suggested a different judicial approach to religious” education, and [p. 499] that ‘ ‘ as between father and mother, any religious question respecting- the child’s religion will be settled by the award of the right of custody”.) Indeed, if the Appellate Division had been of the opinion that an award of custody should not be made to the plaintiff because of the fact that it might result in the child’s education according .to the tenets of the mother’s religion, there would have been no necessity for a remission to this court for further investigation. The possibility that Lewis might be educated according to the doctrines of the Christian Science *87 Church was not one of ‘ ‘ the doubts that evidently troubled Special Term, and that trouble this court ”, for there is nothing in the record on appeal that indicates that the Special Term was troubled by the possibility that Lewis might be educated as a Christian Scientist.
We therefore turn to the question which troubled both this court and the Appellate Division, the solution of which is determinative of the custody issue, viz.: will an award of custody to the plaintiff subject Lewis to a substantial risk that his mother may fail or neglect to furnish him medical care and treatment if he should become ill and need it, because of her views, as a Christian Scientist, toward healing by faith rather than by medicine. At the trial, the plaintiff testified that if the court order required her to call a doctor if her child were ill, she would do so. She added that “ I have called doctors on many occasions ”. Since the making of the decree, dated December 15, 1955, which required plaintiff to cause Lewis to be examined at least once a month by a physician, plaintiff has submitted him to a physician for such examination at least once a month, except that no examination was had between September 22,1956, and the time of the hearing of November 13,1956. The hearings commenced on October 22,1956, and plaintiff’s failure, after nine successive months of compliance, to submit the child for medical examination between October 22 (one month from the date of the last examination) and November 13 appears to have been inadvertent and due to the holding of the hearings as to the question of custody. During this period the plaintiff also took Lewis to a dentist and an oculist for examination and treatment. At the hearing of October 22, 1956, the court, after instructing plaintiff that the law required her to give her boy necessary medical and surgical care, if she had custody of him, asked her whether she would comply with the law. She swore that she would do so, although she did not like to do it because of her religious beliefs. “ Q. But notwithstanding the conflict between your religious beliefs and the order of the Court which would you followsf A. Well, the law.”
An attempt has been made by defendant to establish that plaintiff has failed and refused, on several occasions when Lewis was ill, to furnish him with medical care. A similar charge had been made at the trial by Doctor Forman (“ the family physician ”), but this court discredited his testimony and found “ that the plaintiff herein has not imperiled the health and lives of the children of the parties hereto and she has not failed and refused to secure needed medical attention for the children from licensed physicians and surgeons.”
*88 Two instances of alleged failure to give medical attention tp Lewis were claimed by defendant to have occurred since the trial. The date of the first was September 15, 1956, the Day of Atonement. The defendant had asked to have the boy that day. Defendant claimed that when he arrived home about 2:00 p.m. from the synagogue, he heard Lewis cough and sneeze and that he had his daughter take him to defendant’s “ family physician ”, Dr. Forman. The latter prescribed some medicine. "When the boy was returned to the plaintiff, he brought with him a bottle of the medicine. Plaintiff allowed the child to take the medicine, which he did twice, but she herself did not give him any of the medicine to take. The defendant swore that the child had a fever but Dr. Forman admitted that Lewis had had no fever at the time he examined him and that he was not definite about the diagnosis. He testified that the boy had some rales in his chest and that he had written down “ either bronchial asthma or bronchitis ”. Plaintiff, on the other hand, testified that the boy was well when she took him to defendant’s home; that he had no fever; that she had him examined, by Dr. Pearlman on September 22, only a week later, and the report of Dr. Pearlman showed that he found nothing wrong with the child. The evidence relating to the incident of September 15 fails utterly to persuade the court that plaintiff would deny Lewis medical care if his condition required it.
The other incident took place on Saturday, November 3, 1956. The defendant’s claim that Lewis was ill on November 3 and required medical care and attention has come into the record as defendant’s defense to plaintiff’s motion to punish him for contempt for failure to return Lewis to her at the end of that visitation day. (The court has found defendant to have been guilty of said contempt — see opinion filed on companion motion, decided simultaneously herewith.) On the morning of November 3, plaintiff, in compliance with a previous order of the court, left Lewis at defendant’s home. She had kept him home from school on November 1 and November 2 because he had a cold. Defendant testified that when the boy arrived, he was coughing and sneezing; that he took him to Dr. Forman who said he had bronchial asthma, prescribed some medicine, and told defendant to put Lewis to bed. Defendant testified that he did so and, because of the boy’s illness, refused to return him to plaintiff that evening as required by the court’s order. Dr. Forman testified that Lewis, at the time he examined him, had fever and was wheezing and out of breath. He claimed that when he listened to his chest, he heard sibilant, sonorous, and some crepitant rales. His diagnosis was bronchial asthma and *89 possibly pneumonia. He decided to treat him “ as though he had pneumonia ’ ’ and he prescribed Tri-Sulf anyl. Dr. Forman admitted that the boy’s mouth temperature was 99.6, only 6/10 of a degree above normal, and 100.4 rectally, only 4/10 of a degree above normal. He further testified that by November 6 the temperature had disappeared and he told defendant that it was unnecessary for him to see the child any more. Although the doctor had not seen the boy until November 3, and therefore could not have known whether he had any fever on November 1 or November 2, he testified that, in his opinion, the boy required medical attention on those days. On cross-examination, the doctor admitted that he had not fluoroscoped or X-rayed the child’s chest; that his notes failed to mention the possibility of pneumonia, and that he had permitted the child to be out in the street prior to November 12. Plaintiff admitted that Lewis had a slight cough on the morning of November 3, after she had kept him home for two days, but she testified that she thought it was permissible for him to go out. She testified that she called Dr. Forman that Saturday night, November 3, and said to him: “ Does he have a temperature? ” to which he replied “ 100.4 ”. She asked: “ Well, is it possible for him to be taken out to come home this evening? ” And he said: “ I don’t see any reason why he can’t go home.” Plaintiff went on: “ So I said, ‘ Well, will you please call Mr. Gluckstern and inform him of the fact and I will pick up the child and I will call you back ’ which I did. I called him back and he said that Mr. Gluckstern had not answered him, or hung up on him.” Dr. Forman categorically denied that he told plaintiff that he did not see why the child could not go home, or that he told her that Mr. Gluckstern had hung up on him.
On November 14,1956, Dr. Reardon examined Lewis and found him in good health. Even if Dr. Forman’s testimony and diagnosis are accepted as true, there is nothing in the record to indicate that plaintiff could or should have known, prior to the time she brought Lewis to defendant’s home on November 3, that he had any fever or that he was ill. Nor does her request that the boy be returned to her indicate that she would not have given him proper medical care if he required it. Admittedly the boy’s temperature was only a trivial amount above normal, a frequent occurrence in well persons, particularly children. It is also undisputed that on Saturday evening, November 3, the defendant told Mrs. Gluckstern that she would be permitted to visit with the child the following day alone for half an hour.
Plaintiff testified that when she visited the boy at the defendant’s home on November 4, the day after Dr. Forman’s exami *90 nation, she found him playing on the floor with his father and brother. This testimony too is undenied. The court is satisfied that Dr. Forman’s testimony as to the boy’s rales and as to the proper diagnosis was, to say the least, grossly exaggerated, and where his testimony was in conflict with that of the plaintiff, it is my opinion from an observation of these two witnesses that the plaintiff was telling the truth.
Dr. Eeardon testified that his examination of the boy on November 14, 1956, only 11 days later, showed his general condition to be good and that X rays of his chest on November 16 were negative. He noticed a slight congestion, which he felt was not severe enough to require treatment. He also testified that if a child has a temperature of 100 or 100.5, it ordinarily is unnecessary to call a doctor. Dr. Eeardon testified further that it still was his opinion that after “ observing the attitude and reactions of Mrs. Gluckstern I feel she would seek medical aid if the child were seriously ill ’ ’.
The testimony relating to the incident of November 3 fails to establish in the slightest that the plaintiff, if granted custody of Lewis, would fail to submit him to medical or surgical treatment in the event of an illness requiring such treatment. Even parents who are not Christian Scientists do not rush their children to doctors whenever they cough or have a fraction of a degree of temperature. From the evidence before me, I am convinced that the plaintiff has and will faithfully continue to comply with the orders of the court.
On the other hand, I find that the defendant has failed to pay the plaintiff the amounts ordered by this court for support and maintenance, has attempted to rewrite the decisions of this court, has imposed economic sanctions on the plaintiff, and has contemptuously deprived plaintiff of the custody of the infant for a period of 10 days.
On the present record, to deny to this plaintiff the custody of the seven-year-old boy would be practically tantamount to a holding that a parent who is a Christian Scientist is unfit as a matter of law to be the legal custodian of her own child.
I am satisfied:
1. That the plaintiff, notwithstanding her religious beliefs, will provide Lewis with the necessary medical and surgical care.
2. That she has admirably nurtured and reared this infant.
3. That she is fit and qualified to have permanent care and custody of this child, and
4. That the welfare and interests of Lewis J. would best be served in the custody of his mother.
*91 I am also of the opinion that the defendant has neither the time nor the ability to care for or nurture this young child.
. Custody is therefore granted to the plaintiff with the proviso that she continue to have the child examined by a physician each month and continue generally to provide the child with necessary medical and surgical care. The defendant shall have the right to visit the infant each Sunday from 1:00 p.m. to 5:00 p.m. at the home of the plaintiff.
With respect to the order of remission by the Appellate Division of the support and maintenance provisions to be made for the plaintiff and the infant son, they are to remain the same, namely, $150 per week plus $300 per month in lieu of the use and occupancy of the Wellington Avenue home.
Settle order.