Henry Epstein, J.
The instant proceeding arises from a motion to punish plaintiff Joan W. Kesseler for contempt and to amend the decree of separation of November 9, 1955 and the order of the court of February 24, 1958 so as to award sole custody of the infant child Heidi Kesseler, age 6 years, to defendant Dr. Howard J. Kesseler. The said order to show cause also seeks to enjoin plaintiff from further interfering with the order of this court. Simultaneously therewith plaintiff cross-moved to have the infant removed from the St. Christopher School at Dobbs Ferry, New York, and placed in the custody of plaintiff mother, to hold a hearing on the propriety of the school and for any other relief that to the court might seem *608 appropriate. These motions were referred to this court, which had passed upon the original motions dealing with the child’s custody. Extended hearings have now been held, from May 1, 1958 through May 14, 1958. Full opportunity for the parties to present testimony and other evidence was afforded. In view of the events which transpired before the hearings, and which will be hereinafter commented on, the school requested the withdrawal of the infant and that phase of the cross motion has therefore become academic. The interim custody remains with the respondent, Dr. Kesseler (in whose custody she was when the troubles began) pending this decision on the two motions. While it was said by counsel and Mrs. Kesseler that Heidi was delivered into the doctor’s care for some 20 days while Mrs. Kesseler was afflicted with back troubles, no medical testimony was offered to support this other than counsel’s statement.
This court is concerned primarily with the protection of the infant Heidi, and in ascertaining what course will aid the court in exercising its duty. It is the conscience of this court which must direct the exercise of its sole jurisdiction in the interest of the infant and that infant’s position in our democratic society (Finlay v. Finlay, 240 N. Y. 429, 434; Matter of Bachman v. Mejias, 1 N Y 2d 575, 581). This is the first occasion on which the court has had the benefit of a full review by the testimony of witnesses and the opportunity of observing them and appraising their credibility and the sources of their information. Much was said by counsel for respondent of the prior determinations vesting and affirming custody in the mother. This court has researched the files in this case. The separation decree was entered in an undefended action founded on an abandonment, with custody, visitation and alimony payments agreed upon and provided in the decree by Mr. Justice G-old on November 9, 1955. Dr. Kesseler’s attorneys withdrew the answer and the actual testimony in the separation action occupies less than three typewritten pages. All the other proceedings were on affidavits with much the same sharp conflict in factual observations as has heretofore confronted this court prior to the instant hearings.
In an endeavor to ascertain the best scientific and psychiatric information possible, this court availed itself of the services of a noted psychiatrist, a prominent psychologist and the court’s family counsellor. Careful investigation, study and interviews with all the principals, including the infant Heidi were initiated in the Spring of 1957. By agreement of counsel (May 23, 1957) and in accord with the underlying necessity therefor, such *609 reports have been held confidential. They are available to the appellate courts in a review of the instant decision. These reports are, however, in complete agreement and strongly urge that the welfare of the infant Heidi demands her removal from the household of the mother and that she be placed in an appropriate school for disturbed children. There can be no doubt, in the light of her experiences with mother and father that she is a disturbed child. Let it be noted that “ disturbed ” children may also be brilliant and are quite distinguishable from mentally retarded children. There has been much misunderstanding in this respect in the instant case and the attendant publicity. The decision of this court on the prior custody motions and the direction regarding this school was reached February 18,1958. The actions of the respondent mother in this proceeding rendered the continued stay of the child in the school impossible after but two months. On the request of the school authorities the infant was withdrawn. Let it be said here that the attacks made upon St. Christopher’s School are not accepted by this court as well founded. They are biased, without credible corroboration, and solely designed to aid Mrs. Kesseler. The testimony of witnesses connected with the school is accepted by the court as truthful, calmly given and without any color of favor to either party. Mrs. Kesseler’s objection to the school is based upon her admitted desire to see Heidi brought up as 1 ‘ a little aristocrat ’ ’. Dr. Richard Hoffman, a witness for Mrs. Kesseler, expressed a like view — that the school would not have been chosen by him for a child who should be reared to be an “aristocrat”. The wholesome influence of a “democratic” environment, with children from a variety of backgrounds, where Heidi could, for the first time in her life, learn to think for herself, was completely beyond the apparent comprehension of both Dr. Hoffman and Mrs. Kesseler. The child’s mother, in violation of the school’s regulations, came with a newspaper reporter on one occasion, with the witness Bundle (who had recommended the case as “ a good story ” to a news reporter of the World-Telegram), on another occasion with Dr. Richard Hoffman — and had also sent at least two unnamed persons on an inspection tour of the school.
The testimony given by the witnesses from St. Christopher’s School is revealing. The school psychiatrist (Dr. Joseph S. Miller) examined Heidi on her admission and again after two months in the school. The school was “ well-suited ” to a child of Heidi’s needs and her improvement in overcoming both restlessness and ‘1 withdrawal ’ ’ was evident in the second and last *610 examination. The recession of the child’s “bossy” nature and flaunting of “ material possessions ” were noted by the school’s social worker (Mrs. Findlay) and the administration supervisor of social work at the school (Miss Dorothea Carter). When Mrs. Kesseler brought wholly unsuitable clothing to Heidi, the cottage mother had to ask her to take them back. These were, as the mother herself testified, a small boa (fur scarf), high heel shoes (an Easter surprise), and new dresses, coats, etc., wholly inappropriate for a six-year-old child. Mrs. Burke, the cottage mother, said that nevertheless the child complained “ my mommy doesn’t phone; my daddy doesn’t phone; no one loves me ’ ’, This certainly is not the remark of the 1 ‘ normal ’ ’ and “happy” child as pictured by the mother. When Heidi was assigned to sleep in the infirmary due to the disturbance of other children in her cottage caused by the current publicity, Mrs. Kesseler made phone calls at 2 o’clock in the morning — four calls on one occasion. The infirmary nurse testified to this and the court accepts her testimony, given without any reason for prejudice, despite the violent denial thereof by Mrs, Kesseler. Mr. Melvin Philbrick, executive director of St. Christopher’s impressed this court as a person of distinguished stature and experience in the field of schools for disturbed children. He felt that this child badly needed to live in a “neutral” area for a considerable period of time to enable her to “ get her feet on the ground ”. However, the influence of the newspaper publicity upon the neighborhood children, and the effect of Mrs. Kesseler’s actions upon the school made it impossible for it to continue to have Heidi as a resident pupil. Her removal was then ordered.
In a proceeding of this character, involving the care of an infant child of six years, careful consideration must be given to the background of the household into which she was born. Dr. Howard Kesseler was about 34 years of age when he married Mrs. Kesseler, who was then 41 years of age. This was his first marriage and her fifth. She had first married Lucien Plamondon, a concert cellist, in December, 1939. On her claim of incompatibility they were divorced in 1942 in St. Louis, Missouri. Mrs. Kesseler says he could not beget children. In December, 1942, also in St. Louis, she married Karl Atwood, a soldier attending the officers’ training school. On his being’ ordered to Georgia, she divorced him (also in St. Louis, Mo.) in the Spring of 1943 — also on the ground of incompatibility. Then on June 2, 1944 she married Lomax Littlejohn in a civil ceremony in Bronx County and divorced him in Heno, Nevada in the Fall of *611 1945. Within weeks after this divorce she remarried Mr. Little-john in Virginia City. Again, in 1949, this marriage ended in an annulment on the ground that her husband refused to have children. Throughout this cyclonic marital experience there runs an inescapable theme, which again repeats itself in the instant case. On May 3, 1950 Dr. Kesseler and Joan Wagstaff Kesseler were married in New Jersey in a civil ceremony. On June 17, 1950, in Tarrytown, New York they were married in a “ social ” and church ceremony in the presence of a number of friends. Dr. Bichard Hoffman, who was to appear as a witness in this proceeding, gave the bride away. Heidi was born on July 15,1951. Their marital troubles began almost immediately. To provide more suitable quarters, after Heidi came into their lives, Dr. Kesseler removed the family from 10 East 67th Street to 1060 Park Avenue, where they had 2 large bedrooms and 2 baths. In February, 1953 they again moved to a larger apartment in the same building, now still occupied by Mrs. Kesseler. Each parent accuses the other of neglecting the baby and putting on a show of affection for neighbors and guests. In this there may be a germ of truth. Nevertheless on the over-all survey of the evidence and the nature of the testimony given, the court is driven to the conclusion that as between Dr. Kesseler and Mrs. Kesseler, the overwhelming balance in favor of credibility is with Dr. Kesseler.
There are many factors and incidents which bring the court to this conclusion. What strikes this court as significant is the obvious enjoyment of the anguish of her husband by Mrs. Kesseler. The record is plentiful in this respect and it is deemed inappropriate to detail such in this opinion. The respondent wife’s actions, willful and arbitrary, may well have been governed by unconscious neurotic compulsions begotten out of prior unsuccessful and therefore unhappy marriages. She may well be the victim of mental and social restlessness, groping for a revenge upon one to whom she has attributed her latest marital failure.
All the vile accusations against her husband, which were detailed in the many affidavits, find parroting echoes in the testimony of Mrs. Kesseler’s friends. Among the most obviously false were those associated with the infant Heidi returning from the periodic week-end visits with her father, smelling from alcohol, “ martinis ” and “ drunk Not only are such charges scarcely credible but they are made more ridiculous when analyzed in the light of the affidavits of Mrs. Kesseler, from which they are recited by the witnesses almost verbatim. Mrs. Bundle, *612 wife of Walter Bundle, associated with Newsweek, testified she could not distinguish between the smell of cough medicine and a “ cocktail ” on the breath of a child of 5 years. Yet she had listened to Mr. Bundle and Mr. Plotkin, the counsel for Mrs. Kesseler, read parts of the affidavits containing such accusations. Mr. Bundle says he smelled “ beer ” on one occasion and ‘ ‘ gin ’ ’ on another when Heidi was returned from week-end visits with her own father. These are but a few of the fantasies spread at length in affidavit form by Mrs. Kesseler, which are, with no other verification, repeated at the trial.
Dr. Kesseler is a native-born American. His war record is excellent and he served in the Pentagon with distinction. Yet the court is asked to accept as true the tales related by Mrs. Kesseler, as attributed by her to Heidi, that the child was taught to scorn the American flag; to believe herself a “German girl” and that “Hitler” was a great and patriotic leader.
A little child is made the source of alleged degrading attacks of immoral conduct by Dr. Kesseler and- Miss Di Giovanni, the supervising nurse on the night shift at Lenox Hill Hospital. This young woman impressed this court as truthfully modest and without the bitterness that might well have been expected in the light of the attacks on her. She is a member of a distinguished family in this city. She often helped Dr. Kesseler care for Heidi, as in cases when the father was called to the hospital for an emergency operation. She heard Heidi say her prayers before going to bed and her testimony, as well as her personal impression on this court, gives the lie to the vile implications in the testimony of Mrs. Kesseler.
There are several incidents in the course of the testimony in this case which are more than mere coincidence. The matter of alleged assaults on the child is one. The assault story, supposedly related by the child (according to Mrs. Kesseler) as having taken place in St. Christopher’s School, is identical with the same story having been related by Heidi to Dr. Kesseler on other occasions. For example, it was told by Heidi as having-occurred in Public School No. 6 before Christmas in 1957. On another occasion Heidi is said to have related a similar incident in connection with her maternal grandmother, Mrs. Kaufman. The very nature of the stories and their variations in locale is evidence of disturbance in the child.
During the course of this proceeding the court permitted Mrs. Kesseler to have Heidi with her on Saturday, May 3, 1958. The understanding was that the child was to be returned to Dr. Kessler on Saturday evening. This was not done. When *613 the court proceedings resumed on May 5, Mrs. Kesseler’s counsel claimed that the reason for the violation of this agreement was an alleged injury to Heidi. A clear conflict was found in the testimony of medical witnesses — concerning Heidi’s physical condition at that time — even among doctors called by counsel on behalf of Mrs. Kesseler herself. In order to have independent testimony both counsel asked this court to name a pediatrician unconnected with either party and not known to either of them to examine Heidi. This court asked and received the name of a noted pediatrician from St. Vincent’s Hospital. He examined Heidi and by agreement of counsel his report was made to this court and not revealed to anyone until read into the record. The report of this physician completely destroys the story of Mrs. Kesseler and the testimony, however guarded, of her witnesses who are admitted to practice medicine. One of these, who has practiced medicine since 1926, treats disturbed adult alcoholics. She was called to meet mother and child by Walter Bundle, the Newsweek employee who testified as a “friend” of Mrs. Kesseler.
There were many other incidents which must have had an influence upon this child’s emotions. Dr. Kesseler, her father, was before his marriage a member of the Boman Catholic Church. He had married out of his faith and had, on his marriage, joined his- wife’s Protestant affiliation. Yet, after his separation from Mrs. Kesseler, the father on the occasion when his daughter was with him on a week-end before Christmas took her to Mass in a Catholic Church. For this he was severely chastised and threatened by both Mrs. Kesseler and Mr. Plotkin, her counsel. There was no denial of this.
The testimony of Mrs. Louise Harris, a nurse who had charge of Heidi for six days in 1956, when the child had chicken pox, reveals a strange household. The nurse was in attendance from 9:00 a.m. to 5:00 p.m. daily. Dirty clothes were everywhere and the child was fed “ mayonnaise ” as a basic food. While this is scoffed at by counsel and denied vehemently by Mrs. Kesseler, it is strange that one of Mrs. Kesseler’s chief witnesses, Mrs. Newman, confirmed that Heidi1 ‘ would eat anything with mayonnaise ” and “ loved mayonnaise ’ ’. When, on May 3,1958, Heidi was examined at her mother’s instance by Dr. Cyrille Halkin, the latter testified that the child’s statements were given in answer to questions posed by her mother and not by Dr. Halkin. It is many such small incidents with their consistent contradictions which, pieced together, make the case against Mrs. Kesseler so overwhelming.
*614 In view of the background of this case and the number of times the names of “ Tino ” and Mrs. Kaufman (Mrs. Kesseler’s mother) arose, one might have expected that Mrs. Kesseler would call upon them to testify in her behalf. ‘1 Tino ” — whose name is Justino Abad, a gardener employed by the City of New York, has lived in the home of Mrs. Kesseler at 1060 Park Avenue and did household tasks in return for room and board. He now pays $100 a month to Mrs. Kesseler for rent and board. Mrs. Kaufman is the mother of respondent and was, according to Mrs. Kesseler, a frequent visitor to the apartment at 1060 Park Avenue. Yet neither “Tino” nor Mrs. Kaufman, her own mother, living in Manhattan, was called by her as a witness. Why? Nor can respondent be given complete credence when she tries to explain her continued residence in an apartment at 1060 Park Avenue with annual rental of $3,264, equal to 70% of her income. Mrs. Kesseler admits having no other source of income than the alimony allowed. In the course of this trial, lasting over a period of some 12 days, respondent appeared every day in a different costume, attractively attired. Her testimony to the effect that she spends some $300 a year for clothes for Heidi and only $100 a year on her own clothes defies belief.
On cross-examination of Dr. Kesseler, counsel for his wife sought to introduce into evidence letters written at his wife’s dictation while they were living together as husband and wife. These letters were addressed to persons named by Mrs. Kesseler and were written by Dr. Kesseler. They were never mailed, but were retained in original form by Mrs. Kesseler — for future use. The occasion for which they were apparently retained was such as this. Since they antedated the separation and were never mailed, the court refused to admit them in evidence. They were dated as far back as 1954.
Counsel for Mrs. Kesseler in his affidavit of April 18, 1957, on the motion for custody, returnable on April 23, 1957, states: ‘ ‘ If the petitioner’s charges are untrue and made without cause, then she is an unfit mother ”. “ This court has a duty to examine and resolve the issues herein with every facility at its command and upon a plenary hearing of all available proof Counsel for Mrs. Kesseler in the same affidavit states: “ I have seen statements from reputable private investigators. All these tend to corroborate the petitioner’s allegations, and all these and many more have offered to testify under oath before this court in substantiation of the petitioner’s charges herein ”.
That hearing has now been held. No such “ reputable ” or any other “ private investigators ” were called and no such *615 substantiation of petitioner’s charges has been presented. This court adopts the suggestion thus made by Mrs. Kesseler’s counsel. Since it is the court’s considered judgment after soul-searching analysis, that Mrs. Kesseler’s charges “ are untrue and made without cause”, in the words of her own counsel, “ she is an unfit mother ”.
Dr. Kesseler desires to make a home for this child, free from the searing influences that have heretofore beset her. He has categorically denied the vile accusations made by his wife and this court believes he tells the truth. He intends to move to larger quarters if Heidi’s custody is entrusted to him. Dr. Kesseler’s aunt now lives with him and cares for Heidi and either his aunt or his mother will live with him and care for the child while in his custody. This will give the infant a far more peaceful and wholesome home than that furnished by the mother. This court subscribes to the principles laid down in the leading custody cases, such as People ex rel. Portnoy v. Strasser (303 N. Y. 539, 542) cited by counsel for Mrs. Kesseler. The basic principle is love and affection, not exploitation and hurt. This is one of those rare cases where the father is the more loving parent, not the mother.
Throughout the proceedings in this trying case this court, in the interest of public decency, directed that there be no public admitted to the courtroom. Such ruling is believed as appropriate in this court in its Family Part as in the Domestic Relations Court. At times counsel for Mrs. Kesseler seemed bent on goading the court into withdrawing from the case. Counsel has conducted himself, and Ms wife (Clara Storper) acting as co-counsel has so conducted herself during this trial as to warrant the consideration of the organized Bar and for this reason a copy of the record in this case is being directed to the family court committee of the Association of the Bar of the city of New York at the latter’s own request. In the concluding paragraph of his brief, counsel for Mrs. Kesseler “ offers an unreserved apology and earnestly requests that the court not allow any justifiable impatience with counsel to affect its judicial consideration of the merits of his client’s cause ”. The apology is received. This court has not permitted the questionable tactics of counsel in any manner to affect the court’s consideration of the merits.
In this proceeding the court has admitted the filed papers in the motions heretofore made so that an appellate court will have everything pertinent before it, as did this court. In his affidavits on two prior motions counsel for Mrs. Kesseler charged Dr. *616 Kesseler with immoral conduct in the presence of his infant daughter. In his opening statement on this proceeding Mr. Plotkin, counsel for Mrs. Kesseler, stated that he did not make any accusations of adulterous conduct against Dr. Kesseler. In the proceedings in open court he again resorted to the charges made in his own affidavits, all based on the tales told by this frightfully confused infant. These affidavits by counsel himself deliberately and unequivocally charge Dr. Kesseler with such conduct. The testimony elicited by him from Mrs. Kesseler, by purporting to quote the infant daughter, seeks to substantiate such charges. This court cannot shut its eyes to such conduct. Says counsel at page 30 of the minutes: “If your Honor will read those affidavits your Honor will not find any charge of adultery anywhere in any affidavit prepared as long as I have been in this case ”.
On two pages of his own affidavit of May 10,1957, Mr. Plotkin ■refers to Miss Di Giovanni as the doctor’s “ paramour ”. Again in his prior affidavit of April 18, 1957, counsel charges Dr. Kesseler with immoral conduct. These cannot be reconciled with counsel’s statement, nor does his apology at the end of his brief constitute either excuse or acceptable explanation.
Professor Sheldon Glueck and Dr. Eleanor Glueck are agreed that the most lasting and formative influences on young people are those exerted in the years between the cradle and the ‘ ‘ teens ’ ’. This child has suffered tragic influences in the few years of her life. It is this court’s hope that she will be spared as much as possible of the poisoned atmosphere which has heretofore surrounded her.
The motion to the extent that it seeks to punish Mrs. Kesseler for contempt is denied. Custody of the infant Heidi is awarded to Dr. Howard Kesseler, the father. The mother, Mrs. Joan Kesseler, is allowed to have the child visit her at 10:00 a.m. on Saturday of each week, but not without the presence of a person designated by Dr. Kesseler to accompany and remain with Heidi. This is deemed essential to prevent any physical abuse of the infant or other action which might interfere with the peace of mind of the infant. The child is to be returned to Dr. Kesseler by 6:00 p.m. on each such day. The order to be entered hereon shall constitute an amendment of the custody provisions of the decree of separation.
Submit order not inconsistent with the foregoing.