Nanette Dembitz, J.
The proceeding at bar arises from a visitation dispute between divorced parents; it resulted in respondent father’s reduction in his monthly payments of $3,025 for alimony and child support to an amount for child support alone (plus the two children’s private school expenses). The primary issues are whether petitioner should be awarded the large arrears that have accrued because of the reduced payments, and whether visitation should now be directed between the children and respondent father despite psychiatric opinion to the contrary.
Petitioner mother and respondent father, married in 1952 with two daughters born respectively in 1962 and 1967, were divorced in 1970 by a Mexican decree; the visitation provisions which were concededly breached by petitioner, were detailed in a separation agreement that was incorporated but not *196 merged in the decree. This proceeding was transferred to this court by the Supreme Court with an opinion ruling that petitioner’s failure "to comply with the visitation provisions of the agreement * * * may * * * be a defense to a claim for support payments.” [1] This court is bound by that ruling, it being not only the law of the case (see Mount Sinai Hosp. v Davis, 8 AD2d 361; Brown v Brown, 71 Misc 2d 818, affd 39 AD2d 897) but a condition of the transfer. In any event, this court’s ruling as to the general dependency of support and visitation provisions would perforce be the same. (Callender v Callender, 37 AD2d 360; see, also, Matter of Fleischer v Fleischer, 25 AD2d 901; Webster v Webster, 14 Misc 2d 64, 68).[2] Petitioner contends, however, that she is entitled to the arrears in support payments because compliance with the visitation provisions would have been detrimental to the children’s welfare. On this issue the effect on the dependent conditions doctrine of the interest in the child’s welfare, — the Supreme Court did not rule.
1. Bearing of Child’s Welfare on Dependent Conditions Rule.
A proviso that visitation can be modified or terminated if it is detrimental to the child must, as a matter of public policy, be deemed an implied term of any agreement or decree. Support arrears therefore must be paid despite the breach of visitation provisions as written, if their effectuation would have disserved the child’s welfare. (See Abraham v Abraham, 44 AD2d 675; Matter of Sawyer v Larkin, 37 AD2d 929; (Altschuler v Altschuler, 248 App Div 768; Matter of Audrey D. v Michael O., 77 Mise c2d 230, 231-232.) The custodial parent must be free from any financial coercion to damage the child and to abdicate proper parental responsibility.[3] Thus, the *197 difficulty of determining after the event whether the agreed visitation would have been detrimental to the children herein, is unavoidable.* ** [4]
While petitioner may invoke the children’s welfare as justification for her conduct, she bears a heavy burden of proof to establish convincingly that the agreed visitation would have been clearly detrimental to them. The visitation provisions, which were the customary and reasonable type, must be deemed at least presumptively valid under Callender, as well as on the basis that they represent the judgment of presumably concerned parents. Only a "pressing concern” (Abraham v Abraham, supra, p 676) and proof that visitation is "inimical to the welfare of the children” (Matter of Denberg, 34 Misc 2d 980, 986), justifies the deprivation of reasonable visitation. (See, also, Kresnicka v Kresnicka, 42 AD2d 607 and Herb v Herb, 8 AD2d 419, 422 [only "substantial evidence” justifies a denial of visitation]; Becker v Becker, 28 AD2d 1002 and People ex rel. Chitty v Fitzgerald, 40 Mise 2d 966, 967 [burden of proof on custodial parent].) Visitation must be carefully protected, not only as a phase of the parent’s right to the custody of his child,[5] but also as a phase of the developing body of children’s rights.[6]
2. Children’s Welfare in Relation to Visitation.
Petitioner’s allegation that the agreed visitation would have been detrimental to the children in and after October, 1971 is based on their alleged psychological mistreatment in February, 1971 during their first visit to respondent and his second *198 wife following his remarriage. Both children have expressed adverse sentiments about the 1971 visit and all visitation; the long trial was devoted mainly to evidence as to the quality and reason for their hostility.
a. Admissibility and Weight of Evidence.
Testimony quoting the children’s statements from time to time was elicited both to prove physical acts and the children’s beliefs or feelings. Such testimony appears admissible on the ground that a child’s contemporaneous statements may be more reliable than his later testimony or statements in a court interview, particularly when, as here, his recollection of past events is likely to be molded by his subsequent discussions of them with adults. Compare Matter of Lincoln v Lincoln (24 NY2d 270, 272) where the court, approving a Judge’s private interview with a child, stated that it would be "far more informative and worthwhile than the traditional procedures of the adversary system * * * limited modifications * * * of the adversary system must be made, if necessary.” (See Falkides v Falkides, 40 AD2d 1074 [hearsay report as to child admissible in custody case]; Walch v Walch, 52 NYS2d 697, 707; Camp v Camp, 213 Ga 65; cf. State v Reister, 80 NW2d 114, 115-116 [ND] and Gray v Florida, 184 So 2d 206, 207 [Fla] [contemporaneous statement by child admissible in criminal or quasi-criminal case]; Fleury v Edwards, 14 NY2d 334, 341 [general liberalization of rule against hearsay].)[7] Such hearsay must of course be carefully appraised not only from the usual standpoint of the witness’ credibility but also of any circumstances influencing the child’s statement.
Two experts testified as to the children’s feelings towards respondent and the need for petitioner’s curtailment of respondent’s visitation rights. One was petitioner’s psychoanalyst whose focus was conditioned by his patient’s, and whose reliability as a witness was diminished by other factors as well; his testimony is entitled to little weight. While the court-appointed psychiatrist did not suffer from the other expert’s disabilities, the trier of the facts must determine how much weight to give to the testimony of any expert.[8] Here neither *199 expert had a basis for appraising whether respondent’s alleged mistreatment of the children in fact occurred, nor did either of them attempt to appraise petitioner’s influence on the children’s attitudes; the court had the benefit of a mass of evidence bearing on both questions (over 3,000 pages of testimony and answers to interrogatories and 90 exhibits as well as an interview with the older child in conclusion). The statement in Lincoln (supra, p 273) is applicable to a psychiatrist as well as a Judge: "Without a full background on the family and the child, these interviews [by the Judge] can lead the most conscientious Judge astray.” Thus, neither expert was able to offer persuasive opinions on the difficult question of the source of the children’s expression of hostility to respondent.
b. Basis for Children’s Attitude Towards Respondent.
Crediting those psychological perceptions in the experts’ testimony, notes, and reports[9] which appear well based (discussed in the supplementary findings filed herewith), as well as the facts and inferences set forth at length therein, the court finds that the children were not mistreated by respondent or their stepmother during the 1971 visit; that their attitude towards respondent was instead the product of petitioner’s relationship with them and of her attitudes after respondent’s divorce and remarriage, although she never explicitly told them not to visit or to dislike him; that her termination of visitation in accordance with the agreement and decree was not required for the children’s welfare; and that it was rationally feasible for petitioner to have determined in October, 1971 that the alleged mistreatment had not occurred, and to have continued such visitation. The problem of adjustment by young children to separation from their mother and to visitation in the residence of their father and stepmother would here have been overcome but for the effect of petitioner’s attitudes.
A rejection of the noncustodial parent because of the attitudes of the custodial parent unfortunately is not unique to this case. See Lincoln, where the court recognized "the effect of parental differences on the child” and that a child of *200 divorce "is subjected to emotional stresses that may produce completely distorted images of its parents and its situation.” (24 NY2d, at pp 272-273); Matter of Garber v Cooper (40 AD2d 1077): "the child’s attitudes and emotional reactions [towards the father] as they might be demonstrated to a physician would be strongly influenced by the attitude of the mother who had her under her charge and control”; Babin v Babin (16 AD2d 884); Matter of Denberg v Denberg (34 Misc 2d, at pp 981, 987): it is the father’s "remarriage which lies at the root” of the mother’s desire to prevent visitation and her "intense desire * * * to punish” the father for it.
c. Objective Test of Justification for Breach of Visitation Provisions.
The finding against petitioner’s allegation that the decreed visitation would have been detrimental to the children, leaves the question of whether petitioner’s belief to this effect would be relevant. That is, would petitioner’s belief that she was acting for the children’s good, warrant respondent’s liability for arrears although her breach of the visitation provisions was not objectively justified?
Petitioner’s willingness to arrange full visitation in June, 1971, despite the children’s alleged mistreatment the previous February, casts doubt on her state of mind and her good faith when she subsequently denied visitation purportedly on that ground. Nor is good faith shown by her major reliance in the petition commencing this action on the allegation that the younger child suffered a "long illness” due to respondent’s inattention to her medical needs during the 1971 visit; this allegation she must have known from indisputable facts to be false (see supplementary findings filed herewith). Nevertheless, these and other circumstances seem insufficient to support respondent’s argument that petitioner acted in bad faith (cf. Goodman v Goodman, 17 Misc 2d, at p 713) with a preconceived deliberate plan to violate the visitation provisions, like that in Callender and similar cases where their breach excused support payments.
However, it is not only unfeasible but it seems, on balance, inappropriate to explore petitioner’s subjective motivation. A rule that a conscious good intention is enough to justify a destruction of visitation would put visitation rights at the mercy of the custodial parent’s sole discretion pending court *201 decision, and would undermine the Callender rule of dependent conditions. Instead, the "reasonable man or woman” standard, used in contract as well as tort litigation,[10] seems appropriate here. Thus, it is sufficient for the application of the Callender rule that, as found above, "a reasonable man or woman” could have known in October, 1971 that the agreed visitation would not have been detrimental to the children.
3. Respondent’s Support Arrears Excused.
a. Extent of Petitioner’s Breach of Visitation Provisions.
Petitioner did not prohibit all visitation; she permitted and permits daytime visits in the presence of an escort/companion selected by her, thus eliminating the unaccompanied day, weekend, and vacation visitation provided in the agreement and decree. These restrictions appear to abrogate respondent’s visitation rights in essential respects.
Petitioner’s extended presence during visitation, by the stationing of her representative with the children, interfered, the court finds, with a full and affectionate interchange between them and respondent. (See Sackler v Sackler, 19 AD2d 751, affd 15 NY2d 40; cf. Seldin v Seldin, 55 Mise 187, 189 as to condition on visitation.)* [11] Petitioner’s prohibition of overnight stays severely curtailed the extent of visitation because respondent’s professional commitments as an internationally prominent musical conductor and director kept him out of New York. Further, round-the-clock living together is vital in preserving a child’s bond to a father as a true parent — trustworthy and caretaking — rather than a casual host. Thus, it appears that petitioner’s breach went to the essence of the visitation provisions from the standpoint of the applicability of the Callender rule.
b. Petitioner’s breach of the agreed, decreed, and reasonable visitation provisions by prohibiting overnight and unaccompanied visits should, it appears, be deemed a continuing one *202 from October, 1971 to the present.[12] Under Callender respondent’s refusal to pay any support would therefore have been justified during this period (see, also, Harris v Harris, 8 Mise 2d 198; 2 Foster and Freed, Law and Family, p 446); and the Supreme Court underlined this point in its discussion of Callender’s particular applicability to the instant agreement.
However, some decisions suggest that a breach of visitation provisions justifies nonpayment of alimony only, apparently on the theory that payment should be withheld only from the person responsible for the breach or that a father’s common-law duty of child support continues independent of contract or decree. (See Smith v Smith, 255 App Div 652, 656-657; Harris v Harris, 197 App Div 646, 648.)[13] Here respondent has continued to pay a portion of the unallocated $3,025 a month provided in the agreement for alimony and child support, which portion appears from two other provisions to be allocable to child support. Thus, respondent is not obligated for arrears for the period beginning in October, 1971 under either version of the rule that the contract principle of dependent condition governs a dispute which does not impinge on a child’s welfare and concerns only a respondent’s liability to a petitioner for her financial burden for a past period.
4. Interpretation of Agreement as to Summer Visit.
A short period of reduced support payments — from July to October 1971 — resulted from a dispute over an aborted visit that was to commence on June 29, 1971. Petitioner’s claim for arrears for that period involves only interpretation of the agreement as written and incorporated in the decree.
The agreement provided for the children to reside with respondent for specified school-vacation periods and further provided: "During the Husband’s (i) Intersession 1971 visitation and (ii) the 1972 Summer visitation, and (iii) Christmas 1971-1972, the nurse employed by the Wife may, at the Wife’s discretion, accompany * * * the children”. The parties agree *203 that this provision involves a typographical error; that it does not, as written, represent the parties’ intent; and that they intended to include therein the summer of 1971, it obviously being irrational to provide for a nurse in the summer of 1972 and not in the summer of 1971.
Respondent therefore had no justification for refusing to accept a nurse for the June, 1971 visit, nor for reducing his support payments because of petitioner’s refusal to permit visitation without a nurse. He was bound by the agreement in accordance with its intent and his clear understanding of it.[14] The fact that respondent was attempting to secure petitioner’s advance concession that the provision did not cover the summer of 1972[15] is irrelevant to his liability for arrears (plus interest) for the period from July through October, 1971.
5. Court-Ordered Resumption of Full Visitation and Psychotherapy.
Both children have now stated a desire not to see respondent at all. A child’s expressed wishes on visitation must be studied to determine their basis and whether their effectuation will serve the child’s welfare. See Lincoln (24 NY2d, at p 273): "the reasons for its preferences may indicate that no weight should be given to the child’s choice”; Obey v Degling (37 NY2d 768, 770-771); Dintruff v McGreevy (34 NY2d 887, 888); Aberbach v Aberbach (33 NY2d 592 [custody granted to mother, although child left mother’s home for father’s, adamantly refused to return to mother’s and mother was unable in a two-week trial return period to persuade him to change his mind]); Bullotta v Bullotta (43 AD2d 847); Brussel v Brussel (280 App Div 784).
The court has no doubt that the children’s expressed aversion for respondent is based (as detailed in the filed supplementary findings) on conflicting emotions stemming from petitioner’s attitudes rather than on alleged and at worst minor instances of insensitive treatment by him. The evidence is convincing that the children and respondent are being deprived of visitation that would be increasingly beneficial if the children could rid themselves of their psychic stress in *204 relation to it. Further, the irrational antipathy they express for respondent doubtless is a source, as the appointed psychiatrist testified, of psychic distress for them. There is no question that measures should be directed to attempt to heal these wounds.
The appointed psychiatrist recommended that the children should not see their father until they volunteered to do so, and that nothing should be done to hasten the event other than petitioner’s encouragement and respondent’s remote contact through gifts and letters. But the psychiatrist made this recommendation on erroneous premises, when he was incorrectly assuming that respondent had abandoned and grossly mistreated the children and when, it was clear, he had accepted an inaccurate picture of respondent as malevolent and indeed violent and sadistic (e.g., chasing the older child with a knife and the younger with a mask while she screamed in fear). Only on cross-examination did he recognize that petitioner’s attitudes must have had a major impact on the children (see supplementary findings).
If the psychiatrist’s recommendation were followed, it seems clear that the children would have no contact with respondent until their adulthood, if then, unless there were a complete and unlikely change in petitioner. Petitioner’s statements to the children, quoted in the testimony as "I’d be happy if you liked him; you must carry out your obligation to him; you must respect him,” obviously could not overcome the twisted feelings that burden them. Indeed, since a child, as the psychiatrist testified, perceives a parent’s unexplained absence as a rejection, their unrealistic sense of their abandonment by respondent (see supplementary findings) would deepen. To attempt to ease their emotional conflict about ties to both parents, by severing their contact with respondent (cf. Den-berg, 34 Mise 2d, at p 983, supra; Whittemore, 202 Mise, at p 176 supra), would mean for the court to perpetuate a schism for the sake of surface quiet of dubious psychological benefit. The severance of a father’s relationship to a child is a "drastic remedy” even when there are realistic fears of harm (Kresnicka, 42 AD2d 607; Herb, 8 AD2d, at p 422), with unforseeable consequences for the child’s future (in the event, for example, of changes in the mother’s situation). The cases cited by petitioner of denials of visitation are very different from the instant one.
While the court is of course reluctant to direct resistant *205 children to see a parent, full visitation as provided in the agreement and decree should be resumed (for the above reasons and additional ones in the supplementary findings), beginning with two unaccompanied day-visits. Hopefully, such visits will themselves help assuage the children’s unrealistic distrust of respondent.
Except in a drastic exigency, a child’s need for psychotherapeutic treatment should be left to parental discretion (see Matter of Vulon, 56 Misc 2d 19). However, this court has the power to direct psychotherapy for a child in a custody or visitation case (see Richman, 32 Misc 2d, at p 1099; Haghani v Haghani, 44 AD2d 818; Kesseler (nil above), 11 Misc 2d, at pp 609-610;[16] it should do so in a crisis like the instant one. Particularly is this true here where both parents have indicated acceptance of psychiatric learning and methods. The court-appointed psychiatrist recognized that where a child’s expression of hatred for his parent is not "reality-based” on parental abandonment or mistreatment, pscyhotherapy is desirable. Psychotherapy is therefore ordered, in the hope that it will help the children adjust to the resumption of visitation here directed, and help them to benefit from contact with respondent while preserving "their great and understandable affection for their mother” (Brussel v Brussel, 280 App Div 784).
Settle order on notice. This proceeding is transferred back to the Supreme Court, in accordance with its opinion, for a determination on counsel fees.

. The Supreme Court also ruled that this defense was available to respondent despite his option under the agreement to resort to arbitration for a violation of the visitation provisions. See, as to invalidity of any agreement to arbitrate issues of visitation and child support. (Matter of Fence v Fence, 64 Misc 2d 480 and cases there cited).

. Petitioner’s noncompliance with the visitation provisions cannot, as petitioner argues, be justified by respondent’s reduction of support, since he has been continuously ready to restore full support upon petitioner’s compliance. In this proceeding commenced in October, 1971, he counterclaimed for elimination of support payments or increased visitation. Thus, such decisions as Klarish v Klarish (29 AD2d 929) are irrelevant.

. The dependent conditions doctrine must also be applied with due regard for the *197 child’s welfare, when visitation is withheld from a father who is financially unable to support, or when, conversely, his denial of support because of a visitation difficulty leaves a child in economic need (see, e.g., Babin v Babin, 16 AD2d 884; cf. Goodman v Goodman, 17 Misc 2d 712, 714); however, these concerns are irrelevant to the instant case.

. The unfortunate delay in completing this proceeding (the trial continuing to May, 1975 and final briefs received in November) was due in part to the usual fortuities of a long trial with a number of witnesses, but mainly to the fact that the case arose during an interim when there was no provision in this court for a continuous trial from day to day. The Supreme Court denied the application of both parties, because of the scheduling delay in this court, for a vacation of its transfer.

. See Stanley v Illinois, 405 US 645, 651, and cases there cited; May v Anderson, 345 US 528, 533-534.

. See, e.g., Matter of Ray AM., 37 NY2d 619; Matter of Malpica-Orsini, 36 NY2d 568, 572-574. As to the child’s stake in visitation, see Matter of Denberg v Denberg, 34 Misc 980, 986; Goodman v Goodman, 17 Misc 2d 712, 714; Matter of Whittemore v Whittemore, 202 Misc 175, 178.

. As to anyone’s declarations showing his state of mind or feeling, see 6 Wigmore, Evidence (3d ed), §§ 1714, 1715, 1730, 1731; Richardson, Evidence (9th ed), §§ 270, 271.

. Matter of City of New York, 1 NY2d 428, 432; Commercial Cas. Ins. Co. v Roman, 269 NY 451, 457, People v Crieco, 82 Mise 2d 500; Matter of Richman, 32 Mise 2d 1090. 1098.

. The court-appointed psychiatrist’s report, used by both parties in examination of the psychiatrist, was clearly admissible since there was here a full "opportunity to explain or rebut material contained in the reports.” (Lincoln, 24 NY2d, at p 273. See Jezowski v Beach, 59 Mise 2d 224, 225.)

. Holmes, The Common Law (37th Pr., 1945) 78 et seq.; see Hill, Damages for Innocent Misrepresentation, 73 Col. L Rev 679. The custodial parent thus acts at her financial peril if she denies visitation because of her subjective view of the children’s welfare; however, such a risk is the common and necessary adjunct of an objective standard of judgment.

. See, also, Kesseler v Kesseler, 11 Misc 2d 607, 616, affd 10 AD2d 935, revd on other grounds 10 NY2d 445.

. While the children’s attitude may have during this period become so resistant to overnight visitation that it was no longer feasible, any such development would have been primarily attributable to petitioner’s acts and attitudes (see supplemental findings). Further, the court finds from the evidence as to the day-visits that the children would have accepted such visits without petitioner’s representative.

. See, also, Werber v Werber, 47 Misc 2d 399, 402; Blumberg v Blumberg, 117 NYS2d 906, 909; Kelley v Kelley, 38 NYS2d 344, 349; Magrill v Magrill, 16 Misc 2d 896. 901.

. See Harris v Ublendorf, 24 NY2d 463, 467; Hart v Blabey, 287 NY 257, 262; O’Neil Supply Co. v Petroleum Heat & Power Co., 280 NY 50, 55.

. However, the court finds respondent’s construction of the agreement was correct, there being no evidence of any mistake other than the substitution of 1972 for 1971 on the otherwise chronological series of vacations.

. See also Kesseler v Kesseler, 10 NY2d 445, 452; People ex rel. Ruppert v Dinin, 49 Misec 2d 585, 588; Slegman v Kraitchman, 30 AD2d 979; Kumbartzki v Kumbartzki, 38 AD2d 824, 825; cf. Gluckstem v Gluckstern, 17 Misc 2d 83, affd 3 AD2d 999, app den 4 AD2d 832.