Nanette Dembitz, J.
In this dispositional phase of a neglect proceeding under the Family Court Act of the State of New York — to determine the proper care and custody of children found to be “ neglected ” — an important and novel question of iaw is presented as to the admission and use of psychiatric reports.

Stages of Proceeding

This proceeding began with a petition filed under section 331 of the Family Court Act by a caseworker of the Society for the Prevention of Cruelty to Children, alleging that Robert and Anne Blaine, now aged 11 and 9, are neglected children within the meaning of the act. The petition alleged that the children are ‘ ‘ without proper supervision and guidance in that their parents quarrel in the presence of the children and the father is physically abusive to the mother, the mother drinks alcoholic beverages to excess ”, and the home is dirty and disordered. (The iSPiCC filed this petition following a complaint to that agency iby Mr. Blaine about his wife’s behavior.)
At the “ fact-finding ” hearing before another Judge of this court, conducted pursuant to section 344 of the. act, the allegations were upheld and a finding of neglect on the part of both parents *251 was made. Thereafter an order of disposition was entered under sections 352 and 354, discharging the children to the custody of both parents but placing the latter under the supervision of the court’s probation service for the period of one year.
The present stage of the proceeding was instituted about six months after such dispositional order, by the father’s petition alleging the mother’s violation of it, in that she “ drinks excessively in the presence of the children ’ ’. His petition also alleged that a few days prior thereto the children on returning home from school in the afternoon had found the mother in bed with a male friend and that he, the father, had found the latter in bed in the home at 7:30 that evening.
At the hearing held on this petition under section 372, at which the father was represented by an attorney but the mother was unrepresented, the father supported his testimony as to the mother’s excessive drinking with several flash-bulb snapshots he had taken of her, apparently in the home, in a stuporous condition. The mother made no effort to disprove the father’s testimony; her courtroom attitude, however, suggested the possibility that her position reflected a feeling of bitterness or helplessness in the proceedings, rather than the irrefutability of the evidence against her. Nevertheless, on the available evidence the allegation as to her drinking was upheld. Adultery by the mother in the children’s presence was not established.
At the suggestion of the father and with the consent of the mother, the children were temporarily placed in the home of an aunt, pending further investigation to determine whether any change in the original order of disposition had become necessary. Both parents were given the right to visit the children freely, except that the mother was prohibited from visiting if she was under the influence of intoxicating liquor.

Hearings to Consider Present Needs of Children

At the two hearings thereafter held to determine the appropriate disposition, Mr. Blaine’s position was that despite his accusations against his wife, he did not desire a separation, but only wanted her to secure treatment for her alcoholic problem; he also maintained that his care and attention to the children was particularly important for their welfare because of her excessive drinking and, in effect, that he should be given their custody. Mrs. Blaine, on the other hand — now also represented by an attorney — claimed that she never drank to an extent that was detrimental to her care of her children; that her husband’s charges, arguments, and provocative behavior caused constant friction; and that the best solution for the children would be to *252 discharge them to her custody in the marital home (an apartment in a two-family house owned by the husband) with him excluded from the home except for visitation rights.
The probation officer working with the family, who had not been available at the prior hearing, testified that he had never observed Mrs. Blaine under the influence of liquor during his several visits; whenever he had seen her in her own home or in the home of the aunt since the children were staying there, she had been attending to them or household chores and the quarters had been well kept.* (The proceeding being more than a matter of private interest, the court inquired into the availability of an impartial witness, besides the probation officer, as to the mother’s conduct; but this inquiry proved futile.) When the children were called by the court for an interview (in the presence of both counsel) and drinking was discussed, Anne recalled that her mother had “ fainted ” several times. While her remark suggested support for the father’s allegations, the weight to be accorded it was doubtful.
School reports presented by the probation officer rated both children highly in attendance, academic work, and behavior and described them as appearing well cared-for at home. While the report of a prior investigation by a probation officer stated that Robert had behaved abnormally by setting fires, the court’s questioning of the parties indicated that the father had given an exaggerated account of the gravity of Robert’s behavior, attributing it to the mother’s lack of care, and that the incidents were in fact of a minor nature. For example, on one occasion Robert and several playmates made a fire in a bucket on the back porch, which they then extinguished with water; the father had seen the remaining ashes.
While the children thus had not manifested ill effects from their mother’s and father’s guardianship, the court is intended to exercise preventive authority in behalf of a child who is 11 likely to suffer from the improper guardianship of his parents ” (Family Ct. Act, § 331).[1] In view of the conflicting evidence as to the mother’s excessive drinking and the specter of her uncontrolled and seriously damaging behavior if the charge were true, psychiatric re-evaluation seemed desirable to help the *253 court weigh this issue. (A brief psychiatric study had been obtained prior to the original disposition.) An evaluation of the parents and their relationship hopefully would shed light on whether the father’s charges were motivated by the marital discord or factors other than concern for the children’s welfare, and whether his testimony therefore should be discounted. (Cf. Rupp v. Teets, 117 F. Supp. 376, 379, 383 [U. S. Dist. Ct., N. D. Cal, 1953], app. dsmd. 214 F. 2d 312, cert. den. 348 U. S. 865, with respect to admission in a criminal trial of psychiatric evidence on the issue of premeditation and motive.) Further, the court sought a psychiatric opinion of whether the mother was likely to be an excessive or a controlled drinker; of the children’s psychological state; of the nature of the parental disharmony, and of whether it seemed amenable to therapy. Accordingly, an evaluation for these purposes of all the members of the family by the Psychiatric Consulting 'Service of the court’s Bureau of Clinical Services was directed and the hearing adjourned for the receipt of a report from the service.[2]

Use of Psychiatric Reports

Two questions as to the proper use of psychiatric reports were raised at the final hearing.
The father objected to introduction into evidence by the mother, through her attorney, of a letter allegedly written by a psychiatrist Avhom she had recently consulted. The father’s attorney also objected to the court’s use of the written report made by the court’s psychiatrist, unless he appeared and was available for cross-examination. For the reasons discussed below, the objection to the letter is sustained, and the objection to the report by the court psychiatrist is overruled.
(a) Provisions of Family Court Act on Admission of Evidence
Use of psychiatric information in the various proceedings under the act is clearly envisioned by the broad authority given the Family Court to direct psychiatric examinations (Family Ct. Act, § 251). There is no statutory reference, however, to the admission of psychiatric evidence or reports. Subdivision (b) of section 347, authorizing the use of reports in the dispositional phase of a neglect proceeding (as well as the act’s parallel *254 provisions applicable to other proceedings), only refers to 11 reports prepared by the probation service or a duly authorized agency for use by the court ’ \[3]
The only provision of the act applicable herein is the general section on evidence in neglect proceedings, reading: “ Only competent, material and relevant evidence may be admitted in a fact-finding hearing; only material and relevant evidence may be admitted in a dispositional hearing ” (§ 346).
The omission of the term “ competent ” in the latter half of the section is obviously intended to relieve the court from complying with the rules of evidence and to give it broad discretion in the dispositional hearing. Thus this court is permitted, so far as the statute is concerned, to admit ¡both the letter and the report here in issue. However, there is another criterion besides the terms of the statute. Even if an evidentiary question does not rise to constitutional dimension and present a due process issue, the court has an inherent obligation to exercise its discretion as to the admission of evidence in a manner to insure fairness to the individuals and the trustworthiness of its deliberations. This principle would limit the court even if psychiatric reports were included in subdivision (b) of .section 347; see Matter of Dulay (24 A D 2d 208, 212 [4th Dept., 1965]), where the court, despite the discretion permitted by subdivision (b) of section 347 with respect to probation reports, directed that the person conducting the social investigation in a neglect case appear to testify and to be available for cross-examination.
(b) Fairness in Dispositional Proceedings
The first question in determining fair procedure for a neglect disposition, is whether the same standards apply as in delinquency — .the statutory framework being similar for both proceedings. In a delinquency disposition it has been argued, analogizing to criminal sentencing, that a court may refuse to disclose its factual grounds or to accord any of the protection associated with adversary procedure.[4] In this court’s view, however, delinquency dispositions and criminal sentencing differ *255 in vital respects that demand greater safeguards in the former for fairness and accuracy.[5] The point will not be labored here because, in any event, the dispositional phase of a neglect proceeding is even further removed from criminal sentencing.
The welfare of the child is of course the objective in both neglect and delinquency dispositions, and in both an inquiry is addressed to whether the child’s welfare requires his removal from his home. In neglect, however, the disposition is not in the context of any misbehavior on the child’s part, but solely of the parents’ conduct and capacities. Thus, the civil aspect of the proceeding and the involvement of parental rights are highlighted even more clearly in the dispositional phase of a neglect than of a delinquency proceeding.
Indeed, a neglect disposition bears far greater resemblance to a child-custody proceeding than to criminal sentencing. The theory of the Family Court Act, it is true, seems to be that legal rights are determined, and adversary methods appropriate, only in the first, “ fact-finding ” stage of the proceeding. However, a fact finding of neglect does not necessarily mean that custody will be removed from the parents; whether either or both parents may nevertheless continue to exercise custody and care is decided in the dispositional phase. Thus, both phases of a neglect proceeding taken together determine, as in a custody proceeding, whether to deprive the parent of his ‘ ‘ personal right to their [the children’s] immediate possession ’ ’. (May v. Anderson, 345 U. S. 528, 534 [1953].) [6]
Accordingly, the principles on procedure in custody actions must serve as a guide here. The rule in custody is that “ common-law adversary proceedings and social jurisprudence ” must both be considered, and “ some reconciliation between them is necessary ”. (Kesseler v. Kesseler, 10 N Y 2d 445, 452 [1962].) *256 In the case at bar, as in Kesseler and its progeny, a reconciliation adapted to this particular type of proceeding must be reached.[7]

Admission of Psychiatric Evidence Herein

Scrutinizing the evidentiary problems herein on the basis of this general standard, objection is sustained to the letter that the mother’s attorney sought to introduce from a psychiatrist she had allegedly seen, because no proper foundation was laid for its introduction. Despite the discretion to accept data that is incompetent under the rules of evidence, in the interests of fairness and the trustworthiness of determinations the Judge must have some basis for appraising its weight. While a Judge more than a jury is trusted to give evidence the weight it merits,[8] the Judge too is susceptible to overinfluence from the written word. Here, among other things, there is lacking any information as to the letter writer’s qualifications, if any, as a psychiatrist.[9]
The staff psychiatrists of the court’s Bureau of Clinical Services are, on the other hand, well-known to the court both as to qualifications and standard methods of examination. While under some circumstances it might be necessary for the psychiatrist to be available for cross-examination (and doubtless his appearance would in every case be helpful in appraising his opinion), an insistence on the court psychiatrists’ routinely appearing as witnesses would drastically curtail their already *257 insufficient time to render diagnostic and therapeutic services.[10] Sound and fair methods for handling their reports — with opportunity for refutation by the parties and for judicial appraisal of their validity — must therefore be devised without calling the psychiatrists to the stand, so far as it is possible to eliminate this step.
Accordingly, to weigh the court psychiatrist’s opinions from the standpoint of the extent of his study of the family, the court questioned the father and mother about the duration and general nature of his interviews with them and the children. As to the contents of his report, the court adopted a policy of selective disclosure, based on three premises: (1) All factual data must be disclosed; (2) the tenor of the psychiatrist’s diagnoses and recommendations must be disclosed, unless the court deems it desirable from the therapeutic standpoint to suggest a stipulation of nondisclosure in that regard and the parties so stipulate; (3) the remainder of the report, which would usually consist of detailed and specific psychiatric observations and opinion, should be disclosed unless therapeutic or other policy considerations interdict. (The entire report would be made available to a reviewing court). [11]
To apprise the parties of all data considered on controverted factual issues, the court disclosed the psychiatrist’s view that the mother appeared unlikely to be an excessive drinker. (Compare the practice in custody cases: Siclari v. Siclari, 25 A D 2d 677 [2d Dept., 1966]; People ex rel. Fields v. Kaufmann, 9 A D 2d 375, 378 [1st Dept., 1959].)[12] The court also disclosed that the children manifested no psychic disturbance. Further, it *258 made clear to the father and mother the psychiatrist’s view that neither required individual psychiatric treatment, but that both should attempt i ‘ marital therapy ” (though he had some doubt about its successful outcome). His detailed evaluation of the father’s and mother’s personalities and their emotional relationship, however was not disclosed. These psychiatric diagnoses were only subject to refutation by other expert opinion, which neither party offered in admissible form. And, unless required for the purpose of questioning and refutation by an expert, such intimate revelations in the courtroom seemed untherapeutic, smacking of a breach of confidence and an unauthorized disrobing of each party before the other.[13]
With the foundation of the questioning and disclosures above-described, this court rules the court psychiatrist’s report to be admissible. While looking to the custody cases for guidance away from the practice of complete confidentiality of psychiatric reports in juvenile cases, this court thus adopts a more flexible view on their use than that in Kesseler (10 N Y 2d 445, supra), but one which seems adequate-to assure fairness and reliability.
This ruling, the court is aware, is not entirely consistent with Matter of Dulay (24 A D 2d 208 [4th Dept., 1965]). There the appellate court held that the Family Court’s admission in evidence in a neglect proceeding of a letter from a psychiatrist, who had examined the mother and stepfather at the court’s direction, was improper because he was not available for cross-examination (p. 211). However, the Dulay ruling — which seems to stand alone and apparently has gained little adherence in the Family Court’s actual practice — seems based on the particular circumstances, and primarily to represent disapproval of a Judge’s acceptance, with little or no independent examination of evidence, of a psychiatrist’s recommendation as to custody.
Conclusion as to Disposition — Relation to Principles of Matrimonial Law.
Considering all the evidence, including the court psychiatrist’s evaluation of Mrs. Blaine, the court concludes that she is unlikely to use intoxicants to an extent that would seriously affect her care of her children and that presently requires the court to *259 deprive her of her right to their joint custody. However, the court rejects her contention — though it receives some support in the court psychiatrist’s report — that the children should be discharged to her sole custody, and an order of protection issued under section 356 of the Family Court Act excluding Mr. Blaine from the home except for visitation rights.
The effect of this order would be to enforce and justify Mrs. Blaine’s separation from her husband; the legal standards relating to matrimonial matters should therefore be taken into account. Assuming the validity of the psychiatric analysis of the relationship and of the view that the wife suffered psychologically— and was stimulated to drink — by the husband’s attitudes towards her, the evidence nevertheless did not show cruel and inhuman treatment on his part, nor establish legal cause for a separation.
Principles of matrimonial law would be subordinated if the welfare of the children clearly demanded the father’s exclusion from the home, but this is not such a case. It is to be noted that the opinion of a psychiatric caseworker given in the first stage of this proceeding was to the effect that the father was a source of stability in the home; and the court psychiatrist’s view that the mother would function better if relieved of his presence is of course speculative. While the father’s exclusion would relieve the children from witnessing parental friction, this benefit is insufficient to justify a judicial break-up of the home.
The court is aware that the mother might decide to leave the marital home in such a situation of friction and dissatisfaction, and that a disruption of the home in that manner would be more disadvantageous to the children than the exclusion of the husband. However, the court’s authority to protect against “ improper guardianship ” does not permit usurpation of power to arrange marital relations, or to deprive the father of his right to joint custody and to remain in the marital home, on the subtle and speculative psychological grounds shown in this case.
Pursuant to section 372 of the Family Court Act, read in conjunction with sections 352 and 354 and rules 3.6 and 3.7 of the Family Court Buies, the children are discharged to the custody of the parents; the parents are continued under the supervision of the Probation Department; and appropriate conditions of supervision will be directed.

 All the probation officer’s visits, however, were by appointment.

 Neglect eases originating in the complaint of one parent against another in an intact family, while occasionally a vehicle for marital recrimination, a legal manoenver, or a safety valve for family tension, sometimes reveal a psychotic parent whose commitment the spouse is unwilling to initiate directly or an otherwise clearly incapable parent.

. It is apparent that the dispositional hearings, re-canvassed to some extent issues considered in the fact-finding — a frequent occurrence in neglect proceedings since both phases concern the strengths and weaknesses of the home environment. In this respect neglect proceedings differ markedly from delinquency, where there is a sharp cleavage between the content of the fact-finding and the dispositional hearings.

. The reference to psychiatric data in the original draft of these provisions was deleted. (See Report of N. Y. Joint Legis. Comm, on Ct. Reorganization, p. 123 [1962].)

. See Williams v. New York (337 U. S. 241, 244 [1949]); People v. Peace (18 N Y 2d 230 [1966], cert. den. 385 U. S: 1032) as to the limited protection of due process in criminal sentencing. See Peace (p. 236), suggesting that juvenile proceedings are distinguishable in this respect.

. While Matter of Gault (387 U. S. 1) refrained from ruling on whether “ ordinary due process requirements must be observed ” in delinquency dispositions, the court referred to the need for “ careful inquiry ” in the dispositional phase; pointed out that “The problems of * * * post-adjudication disposition, are unique to the juvenile process ” (pp. 27, 28, 33, n. 48); and throughout the opinion indicated that it is the parents’ interest in the child’s liberty and in their custody of him that is protected by due process as well as his own interest.

. 'See, also, Armstrong v. Manzo (380 U. S. 545 [1965]) with respect to the exigencies of due process in a proceeding for permanent termination of parental rights. The impact of an order as to temporary custody, whether in a neglect or custody proceeding, is less drastic but nevertheless of a similar quality.

. Compare the more doctrinaire position on this point in Task Force Report: Juvenile Delinquency and Youth Crime, President’s Commission on Law Enforcement and Administration of Justice (U.S. Govt. Print. Off., 1967) at p. 27: “Although the effort in a case of parental neglect is always to improve the home and leave the child in it, there are instances in which his own interest requires that he be removed. ’Since in such an order the State is contravening the basic custodial rights of parenthood, the order should be issued by a court as the outcome of judicial proceedings conducted with all the safeguards commonly observed when conflicting custodial rights are adjudicated.” A major difference in result is that custody and care by a State agency or a child-care agency is an alternative in neglect that is rarely, if ever, presented in a custody contest.

. See, e.g., Matter of Brown (201 S. W. 2d 844 [Tex. .Civ. App., 1947]) and Harry v. State (246 Wis. 69 [1944]) applying this doctrine to juvenile court judges.

. Cf. Meiselman v. Crown Heights Hosp. (285 N. Y. 389, 398 [1941]); Hi Filippo v. Gargiulo (278 App. Div. 172, 175 [1st Dept., 1951]); Matter of Egan (241 App. Div. 819 [2d Dept., 1934]); Bridger v. Union Ry. Co. (355 F. 2d 382, 387 [C.A. 6th, 1966]). See Beuseher, Use of Experts by the Court (54 Harv. L. Rev. 1105 [1941]).

. As to the insufficiency of services, see Twelfth Annual Report of N. Y. Judicial Conference (1967, p. 264).

. Nondisclosure of all psychiatric data in the dispositional stage has been thought permissible by some thinkers. (See Report of N. Y. Joint Legis. Comm. on Ct. Reorganization, p. 123 [1962].)
There has been little judicial attention to the question of disclosing psychiatric reports in juvenile proceedings. As to probation reports, some jurisdictions go further than New York’s present discretionary provision and require complete disclosure. (See, e.g., Matter of Dattilo, 136 Conn. 488 [1950]; Gen. Laws R. I., § 8-10-8; see, also, Kent v. United States, 383 U. S. 541, 557 [1966] [waiver proceedings].)

. Any hearsay assertions in the psychiatrist’s report (e.g., a wife’s statement that her husband had committed certain acts) could only have served under these holdings as leads for courtroom questioning — a restriction which seems as appropriate here as in custody proceedings. See, also, Matter of Johnson v. Johnson (21 A D 2d 256 [3d Dept., 1964]), reversing a Family Court determination in a custody case referred to it by the Supreme Court. However, there were no such assertions in the instant report, nor any indication of the husband’s motives other than those already inferable from the hearing.

. Compare policy recommendation as to background reports in delinquency eases in The Challenge of Crime in a Free Society (Report by President’s Comm, on Law Enforcement and Administration of Justice, 1967) at p. 87: “As is recommended for adult presentence reports, in the absence of compelling reason for nondisclosure of special information, those facts in the social study upon which the judge relies in making the disposition decision should be disclosed to the child, his parents, or his lawyer.” (Italics added.)