Nanette Dembitz, J.
This neglect proceeding was initiated by a caseworker of the Bureau of Child Welfare of New York City, by a petition praying for a determination that the three Vulon children are neglected by both their father and mother within the meaning of article 3 of the Family Court Act. At the close of a lengthy hearing, the petition was dismissed.*
Once a determination of neglect is made, the court acquires not only broad authority to control the life of the family but even to deprive the parents of their cardinal right to the custody of their children (Family Ct. Act, §§ 353-355; Family Ct. Rules, rule 3.6, 3.7). Accordingly, a finding of neglect cannot be made lightly; the court should exercise “ its jurisdiction to interfere with parental guardianship reluctantly and only upon strong and convincing proof of unfitness on the part of the parent or material benefit to the child.” (See Matter of Cole, 212 App. Div. 427, 429; cf. People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 469.)
This standard of judicial caution must be observed in applying this court’s mandate to dismiss a neglect petition if its allegations “ are not established, or if the court concludes that its aid is not required on the record before it ” (Family Ct. Act, *21 § 351). The court dismissed the petition herein on both of these grounds.
The hearing showed without contradiction — and indeed from the mouths of petitioner’s own witnesses — that Mr. and Mrs. Vulon are hard-working and 'devoted parents with an intact family, who maintain a well-kept apartment. The children— Maurice, aged 13, Marie, 10, and Michelle, 8, all attending a Catholic school, have good school records with respect to both studies and behavior, and are not known to have ever been the subject of any type of complaint at school or in the community. The court’s interview with the children (in the presence of the attorneys for all parties) revealed them to be well-spoken, well-dressed, well-groomed, and apparently well cared for. How then did this family become involved with the city’s Bureau of Child Welfare?
The bureau’s petition alleges that the three children are left alone and unattended from 3:30 to 5:30 p.m. on weekdays; that after Michelle was admitted to Lincoln Hospital “with severe injury to the vaginal area * * * the hospital reported Michelle as an abused child whose injuries were most likely the result of rape, and the circumstances surrounding this incident were unexplained by the parents.* The undisputed evidence shows that these allegations are misleading in significant respects.
Both Mr. and Mrs. Vulon work to support the family, Mrs. Vulon as an IBM key punch operator. She arrives home from work at 5:30 p.m. or a few minutes before. The three children generally return from school between 3:30 and 4:30 p.m. and then stay in the apartment doing homework. It is questionable whether it would constitute 1 ‘ neglect ’ ’ to leave habitually well-behaved children of ages 13, 10 and 8, unattended in an apparently secure apartment in the afternoon for the two hours alleged in the petition; possibly self-responsibility to this limited extent, in a family where parents show an over-all affection and concern, may not only be harmless but beneficial. In any event, Mrs. Vulon testified without contradiction that since the trou *22 bling incident here involved she had secured someone to stay in the apartment in the afternoons until she returns from work. Thus there is no evidence that the children are likely to be unattended; this court’s statutory mandate is — as in legal principle it must be — to determine whether, despite any past deficiency, children are at the time of the hearing suffering or likely to suffer from neglect (Family Ot. Act, § 312).
The evidence showed that on the afternoon of the incident in issue — which was a partial school holiday — Maurice was in and out of the home doing errands, Marie was washing dishes, and Michelle was first using the vacuum cleaner and then taking a bath. Marie heard Michelle exclaim from the bathroom and saw she was bleeding. Mrs. Vulon came home shortly thereafter, and, although the bleeding was not extreme, took Michelle to Prospect Hospital. There, because no physician was available, she was referred to Lincoln Hospital. By the time of her arrival at Lincoln the bleeding was more profuse and a physician recommended a surgical procedure under anesthesia for remedial and exploratory purposes. One source of suspicion against the family appears to have been that Mrs. Vulon did not immediately consent to surgery for her daughter; she testified that she had wanted to wait for her husband to arrive from Prospect Hospital, where he had expected to meet them. (Mrs. Vulon, who emigrated from Haiti in 1958, speaks poor English.) The father arrived shortly; consent was given forthwith; and the child’s condition was soon remedied.
The Lincoln Hospital physician called by petitioner testified that the bleeding was attributable to a laceration of the vagina of about an inch; that he could not estimate the source of the laceration with any certainty except that rape probably was not the cause; that the condition was probably due to “ trauma ” of some other type and could have been self-inflicted.
The erroneous suspicion of rape — which persisted apparently because of a failure to consult this knowledgeable physician— underlay petitioner’s allegation as to the parents’ failure to explain the circumstances of Michelle’s bleeding. Mrs. Vulon did explain the circumstances to petitioner and other interrogators to the extent she could ascertain them from the children. There is no indication that she knew or could have known anything more than she recounted. What she failed to do was to accept the mistaken allegation of rape and to aid the bureau in its exploration of this suspicion. According to petitioner, the parents “refused to believe that their child had been raped. They .stated that they would not go into any conversation about *23 rape with their children. They explained that in their country, a child did not learn about sex until the child was about 15 years of age; nor did the mother want me to discuss this with the child.”
No doubt Mrs. Vulon’s perturbation (described by petitioner) about the erroneous rape theory was due in part to the great damage that this charge would have inflicted on Maurice, the only suspect, who was an exemplary student in a Catholic school, aspiring to the priesthood. Though Mrs. Vulon apparently was herself concerned' and frustrated that she was unable to ascertain the exact source of Michelle’s bleeding, it was to the benefit rather than the detriment of her children that she refused to succumb to the mistaken suspicion of rape or to give it further currency.
Petitioner’s attorney argued that neglect should be inferred from the parental failure to explain the basis for Michelle’s bleeding. When there is insufficient evidence as to whether or not parents are responsible for a child’s injury, an inference of parental abuse or lack of attention may, under special circumstances, be drawn from the injury itself coupled with the lack of explanation (for example, when a young baby has recurrent fractures, explicable only by either blows or serious falls). In the ease at bar, however, it cannot be inferred — nor has it even been suggested — that the parents contributed directly to Michelle’s condition (which the father believed, perhaps correctly, was due to some esoteric disease process). Further, considering the now-established improbability of rape and the possibility of a self-inflicted wound, it appears unlikely that Michelle’s situation would have been any different if an adult had been in the apartment. In any event, any possible fault in supervisory care has been remedied, as noted above.
Prosecution of this petition was largely attributable, it is clear, to the parents’ refusal of the bureau’s request that they consent to their children’s examination by the court psychiatrist. Such examination apparently was viewed in part by the bureau as a possible method of determining whether Maurice committed the nonexistent rape. So intent was the bureau on its proposal that its attorney approached the court ex parte before the hearing to ask it to order such examinations.
The failure to seek psychiatric aid was not alleged in the petition and therefore cannot, under the Family Court Act, the CPLR, or the due process guarantee of the Constitution, be passed upon in this proceeding as an element of neglect. Even if properly alleged, however, the parents’ rejection of psychi *24 atric aid would not under the circumstances of this case and with the suspicion of rape eliminated, constitute neglect. The Vulons believe that their children’s welfare will not be served by probing into the frightening episode of Michelle’s bleeding by social workers or psychiatrists, and indeed indicate that the repetitive references to the incident to which the children have already been subjected were detrimental.
This Judge personally has confidence in the psychiatric method and in free discussion with children of sex-related experiences. However, one cannot say that this approach has been so successful with our youth that the State can force parents— particularly in a family with a distinctive cultural pattern— to accept it, unless the need and the likelihood of benefit is clear.
It is the function of the trial court ‘ ‘ which has seen and heard the witnesses ” to determine whether neglect exists (see Matter of Cole, 212 App. Div. 427, 428, supra). This court believes from observation of these parents and children that they have an affectionate, mutually respecting and beneficial relationship. A good faith appraisal by responsible and concerned parents, such as the Vulons, of the best way to handle a problem of child development on which reasonable men can differ in their value judgments, is not neglect. (See Matter of Richards, 166 Misc. 359, affd. 255 App. Div. 922; cf. Matter of Urdianyk, 27 A D 2d 122, 123.) While it was necessary and proper to conduct some investigation of whether Michelle’s unusual condition indicated abuse or lack of care, the State cannot, without more justification than here appears, override the liberty of the parents, protected by the Constitution, to bring up their children as they think best. (See Meyer v. Nebraska, 262 U. S. 390, 399.)
Petition dismissed.

 No formal opinion was rendered at the time of dismissal, though the reasons therefor were indicated. In view of a notice of appeal by the Bureau of Child Welfare and the often-expressed appellate view that a statement of the trial court’s reasons is important for adequate review, this opinion setting forth more fully the grounds for dismissing the petition is now rendered.

 Under section 383-b of the Social Services Law, the hospital has the duty of reporting to an appropriate public welfare official any case where there is “ reasonable cause to suspect that a child under the age of sixteen * * * has had serious physical injury inflicted upon him by other than accidental means, or whose condition gives indication of other serious abuse or maltreatment ”. This section was added ’by the section 2 of chapter 631 of the Laws of 1967, effective Sept. 1, 1967, and was derived from a law of 1964. See Paulsen, Child Abuse Reporting Laws (67 Col. L. Rev. 1), as to social desirability of such reporting laws and their recent enactment throughout the United States.