Ralph E. Cory, J.
The instant cases arose with the filing of a neglect petition in the Family Court by the respondent’s mother-in-law. The respondent in the neglect petition is the mother of the infant children involved, Desiree (age 3) and Douglas T., Jr. (age 1).
*29 The respondent mother in the neglect petition filed a petition for a writ of habeas corpus in the Supreme Court to regain custody of her two children, forcibly taken from her by her mother-in-law (petitioner in neglect petition), her husband and other members of his family, on or about April 25, 1970. The mother of the children previously had been awarded full custody and control, pursuant to a separation agreement (Oct. 13,1969).
The Supreme Court subsequently referred the writ of habeas corpus to the Family Court to hear and determine de novo.
The respondent mother in the neglect petition, also filed a petition for support in the Family Court, alleging that the respondent (her husband) had refused and neglected to provide fair and reasonable support for petitioner since April, 1970, and further alleging respondent assaulted her on numerous occasions, making her fearful of the respondent and requesting an order of protection.
All three petitions arise out of the same background, facts and circumstances and are interwoven to such an extent that hearings extending over three days were conducted with many witnesses for both sides testifying. These hearings were held simultaneously rather than separately to save time and practically to avoid duplicity of litigation.
The petitioner mother-in-law alleged in her neglect petition substantially that for the past three years the respondent mother had been using drugs; that many times she left the children unattended; that she had been sexually promiscuous with men in the presence of the children; that she failed to provide the children with proper medical attention and on two occasions was hospitalized — once for allegedly slashing her wrists. As apparent and alleged justification for these acts and charges, the husband of the respondent with the aid of his family, without the consent of the respondent, forcibly took the children from her despite the fact the respondent mother had full custody and control of the children pursuant to a previously existing separation agreement (Oct. 13, 1969).
The Supreme Court, in referring the writ of habeas corpus to the Family Court, ordered that temporary custody of the children shall be with the respondent husband, and that said infants shall be maintained in the home of the paternal grandparents, pending the final order of the Family Court, and pending the final order of the Family Court, visitation rights were granted to the mother, the petitioner, in the writ of habeas corpus proceeding.
*30 When referred from the Supreme Court to the Family Court, the latter court has jurisdiction to determine with the same powers possessed by the Supreme Court, in addition to its own powers, habeas corpus proceedings — for the determination of custody of minors. (Family Ct. Act, § 651.)
This court takes a dim view and does not look with favor upon the unlawful procedure of forcibly taking these children from their mother and lawful custodian, and the pretext under which it was done. Without even examining the facts and circumstances, and based only on the allegations in the neglect petition, the legal provisions under the Family Court Act for originating proceedings to determine neglect by the filing of a petition were never followed by the mother-in-law. (Family Ct. Act, §§ 331, 332, 333, 335, 336, 337.) If the situation was as serious as the petition alleges, why was not the procedure followed in section 337 of the Family Court Act where the court could have issued a warrant, ordered the respondent and children brought before the court and all proceedings commenced in a legal manner ?
The procedures set forth in sections 321-325 of Family Court Act should have been strictly followed concerning temporary removal from the home. Section 322 authorizes temporary removal on order of the court before petition is filed where parent legally responsible for the children, although present refused to consent. In view of the serious allegations in the complaint, particularly ‘ ‘ that the mother for the past 3 years has been using and is addicted to the use of amphetimines and barbiturates and often in the presence of the children ’ ’, the petitioner had ample time to follow the legal course outlined in the statutes. There was more than sufficient time to complain to the Prevention of Cruelty to Children Society, and a case worker or an investigator of the society could have examined into the complaint and filed a petition that the mother had neglected the children. (Family Ct. Act, §§ 331, 332.)
According to a careful analysis of the petition and the above-cited sections of the Family Court Act, there was no provision of law or any section of the Family Court Act that gave the petitioner and her family and the father of the children any authority to act in the unlawful manner they did here. Even section 1024 [Family Ct. Act] of the newly revised Child Abuse and Neglect 'Act does not permit emergency removal without court order, except by a peace officer, or an agent of a duly incorporated society for the prevention of cruelty to children, or a physician treating such a child may keep a child in his custody or a designated employee of a city or county depart *31 ment of social services, without the consent of the mother or person who has lawful custody of the children. (L. 1970, ch. 962.)
Accordingly, there was no justification or excuse for the action taken against the mother of the children in seizing forcibly the infants from her. The respondent husband in the writ of habeas corpus petition testified that on the morning of April 25,1970 he heard the baby (Douglas T., Jr., age 1) crying from the third floor. The infant resided with his mother on the first floor. He testified further that he heard the cries of the baby through a ventilator shaft. Respondent also testified that when he entered the room he saw his wife sleeping on a couch fully clothed with the three-year-old child between her and an identified male. He also later testified that this particular couch was two and one-half to three feet wide. Respondent husband also testified that his young son was in a crib crying in the next room and that he was wet entirely from head to toe. The testimony of the husband was inconsistent in many ways as to this portion of the case. It is also preposterous testimony that would strain the credulity of even an illiterate backwoodsman to the breaking point, particularly that he saw two adults and a young child sleeping on a couch only two and one-half to three feet wide. It is to be noted that the wife’s brother was in the apartment at all times with her, together with a friend of his. The respondent seized this opportunity to forcibly take the children out of the apartment without the consent of the mother, and then with his family, forced the wife to leave. After all this, after they removed the children to the respondent’s apartment on the third floor, they called the police. When the distraught mother tried to obtain custody subsequently of her infant children, accompanied by the police and producing a copy of the separation agreement, the husband and his family refused to turn the children over to the mother. The mother testified on direct examination that her apartment was literally “ invaded ” by her mother-in-law, her husband, his aunt and the husband’s brother — an off-duty patrolman whose revolver was visible in his holster. Frightened, she gave the children up without a struggle because of the nature of the uneven battle involving intimidation and possible violence.
In addition to this testimony, there was credible testimony and proof throughout the hearings that the parties never got along, and that they were separated on three occasions after their marriage (1966). They entered into a separation agreement in November, 1969, giving the wife the custody of the *32 children and the right to live separate and apart from her husband. After the separation, the testimony indicates a vindictiveness and a litany of hate between the parties, in which the children were used as pawns. Credible testimony at the fact-finding hearing showed that the mother, while she had custody of the two children, lived in different apartments and took the children to a few restaurants and ice cream parlors with her. There was no testimony that when the children appeared in public they were ragged or unkempt, but properly and adequately dressed. No testimony was ever adduced that the children were undernourished or unfed. Some testimony indicated a few soiled diapers on the floor, and dirty dishes in the sink— and on this occasion a house in apparent disarray. There was other testimony that on one occasion the baby’s bottom was sore and red, and not properly powdered. The husband testified that on the day in question when he seized the children, the baby was crying and it was wet from head to toe. A child one year old has a natural propensity to cry. Some of the events testified to happen in the best of families, even where expert supervision is provided for babies. This is not neglect per se.
Other relevant testimony that was credible was the fact that the husband was running around with a girl, a fellow employee. This -was not refuted and, in fact, the girl took the stand and verified it, albeit she testified it was on only one occasion. The wife and mother had a confrontation with this girl which apparently produced no happy solution, since there were statements made on the last day of the hearing that the husband was seen riding around the petitioner’s home with this girl in the car. The petitioner wife contends this is some of the harassment her husband and his family were putting her through.
One witness for the husband testified that late one evening she received a telephone call from the mother, stating she was not feeling well and did not feel she could care for the children. This witness came and helped her that very evening, taking her and the children back to her own apartment where they remained until the next day. This can hardly be called neglect, but apprehension and concern about her children that prompted the mother to act in the best interests of the children.
The father of the petitioner (mother of infant children) testified that his daughter called him on several occasions and that her husband and his family were abusing her, and she was frightened. The father, on occasion, came for his daughter and her children, sometimes at 2:00 a.m. and took them to his house. This testimony was not rebutted. This was positive action on the part of the mother, and the antithesis of neglect. A young *33 mother with two small children is no match for aggravating in-laws bent on intimidation, harassment and pressure tactics, particularly while living on the first floor apartment owned by her in-laws. “ She was a bird in a not so gilded cage ”, and if she flew the coop once in a while it was a natural human reaction, perfectly understandable, considering the conditions under which she lived. She had little or no privacy, despite the fact the separation agreement gave her the right to live separate and apart from his interference;' authority and control, as if she were single or unmarried, and to reside to such place or places as she may deem fit and proper, free from such interference from him. This agreement further states they shall not molest each other. Yet incontrovertible testimony by the respondent stated that he sometimes entered his wife’s apartment through the self-same ventilator shaft which he also described as the means by which he heard the baby crying on the first floor from his third floor residence — an incredible invasion of privacy. His testimony also revealed that his aunt occupied the second floor apartment. In short, the petitioner mother was surrounded by hostile in-laws whose apparent purpose, from the testimony adduced, was to spy on the petitioner mother in a calculated scheme of harassment that had for its goal the illegal seizure of the children from her which occurred on April 25,1970. The testimony of the petitioner’s in-laws, and her husband verified this fact that they were acting in effect as prosecutor, judge and jury. Yet the credible testimony adduced the self-evident fact that the respondent husband was not exactly the ‘1 All American Boy ” and his “ actions were somewhat less than heroic ”.
Medical testimony of a physician, who had treated the mother of the children for years, did not produce one scintilla of evidence that she was addicted to drugs, as the neglect petition alleged. He testified he treated her for nervousness only.
Section 312 of the Family Court Act defines a neglected child as a male less than 16 years of age or a female less than 18 years of age.
“(a) whose parent or other person legally responsible for his care does not adequately supply the child with food, clothing, shelter, education, or medical or surgical care, though financially able or offered financial means to do so; or
“ (b) who suffers or is likely to suffer serious harm from the improper guardianship, including lack of moral supervision or guidance, of his parents or other person legally responsible for his care and requires the aid of the court; or
*34 “(g) who has been abandoned or deserted by his parents or other person legally responsible for his care.”
Welfare of children is the objective in neglect proceedings and inquiry is addressed to whether child’s welfare requires his removal from his home. (Matter of Blaine, 54 Misc 2d 248, 255.)
The welfare of the child is paramount and only proper consideration for determining custody of children. (Matter of Cornell v. Hartley, 54 Misc 2d 732.)
In neglect proceedings, court’s duty is to determine whether, despite any past deficiency, children at the time of the hearing are suffering or likely to suffer from neglect. (Matter of Vulon, 56 Misc 2d 19.)
Accordingly, the statute (Family Ct. Act, § 312) and cases herein above mentioned, must be applied carefully to the facts of the instant case to determine if there has been any neglect on the part of the respondent mother.
The testimony to which any credibility could attach never directly connected the neglect of the children by the mother. There was no evidence of neglect that was consistent, open and notorious. There was no doubt the mother’s conduct was not perfect. She went around in groups with men and girl friends and even on occasions went to a few bars and restaurants. There was some conflicting testimony that the mother may have been at one time a bar maid or associated with bar maids. This is not neglect per se because not one iota of evidence was produced to show that the children suffered while under the supervision of baby sitters, always provided by the mother, when she was away. There is no proof that the mother had an excessive drinking problem, although there was some evidence that she drank beer to excess, but far from conclusive to show it resulted in neglect of her children.
No testimony was produced that the children manifested ill effects from their mother’s custody or that as a result of neglect they had to be hospitalized. No medical testimony or proof was offered to this effect.
A mother does not have to be an expert in the care and bringing up of children. She is not required to be a Dr. Spock. She is not required to be a professional nurse. She is not required to be the neatest housekeeper in the world. The mother’s conduct may not have been perfect, and she exhibited a flair for a semi-hippie life. Who is going to judge the mores of the community today? Certainly not a vindictive husband whose own conduct left much to be desired.
*35 Courts have even held “ The mother may have been in fault and the father blameless, and yet the age or condition of the child may require a mother’s care ”, Children at the tender age of three and one, respectively, are entitled to have such care, love and discipline as only a good and devoted mother can usually give. (Ullman v. Ullman, 151 App. Div. 419, 424.)
The evidence in this case does not support the contention that the mother may have been at fault and the father blameless. The husband contributed nothing to blissful domesticity or any attempt to make the marriage work. Instead, he embarked upon a vindictive campaign to get the children away from their mother while at the same time carrying on an extra marital affair with a female coworker. If the law of neglect were based on a theory such as comparative negligence, by analogy, more fault would be with the husband than with the wife in the instant case. The husband, according to the credible testimony, was merely a roomer in the house when the parties were living together. He refused to recognize his wife as a human companion throughout the course of the marriage, which constituted a course of conduct from which may properly be drawn an inference of settled hate and estrangement.
Even though the husband testified he had to get up in the morning on occasions and feed the children breakfast, and even iron his own shirts, this, would not be neglect but could be characterized by the court as evidence of laziness or tiredness on the part of the wife. The wife denied this allegation, under oath. While these are the duties of the wife, in countless homes the husband often pitches in, in this manner.
A court should in doing equity take into consideration all the facts and circumstances of the case to properly assess whether or not there was neglect by the wife. Based on all of the foregoing, this court concludes as follows:
1. There was no evidence that the wife failed to exhibit motherly care and concern for her young children, common to most mothers.
2. There is no credible evidence that wife is guilty of prolonged immoral conduct.
3. No evidence the children were whipped in a cruel and inhuman manner or that the mother cursed them with vile and indecent language.
4. The mother’s lack of care for the children was of a minor nature and the whole proceedings are a vehicle for recrimination.
*36 5. All the things allegedly done here are of a miscellaneous nature. The attempt to magnify them into acts of neglect was going beyond the bounds of credulity.
6. There is no credible evidence of inadequate food, shelter or clothing, inadequate medical care, abandonment or desertion or improper guardianship by the mother.
This court had ample opportunity to judge the credibility of the parties and the witnesses and the weight of their testimony and the credibility to be attached to testimony in conflict. Accordingly, I find no evidence of neglect under section 312 of the Family Court Act and no evidence that the children’s welfare require their removal from their home with their mother. (Matter of Blaine, 54 Misc 2d 248, supra; Matter of Cornell v. Hartley, 54 Misc 2d 732, supra; Matter of Vulon, 56 Misc 2d 19, supra.)
The neglect petition is ordered dismissed because the competent, material and relevant evidence does not support the allegations of the petition by a preponderance of the credible evidence.
As to the petition for the writ of habeas corpus, the respondent is ordered to return both children to the petitioner mother immediately. Custody of the children had been awarded to the mother previously under a pre-existing separation agreement dated October 13, 1969. Under the terms of this agreement the petitioner wife had full custody and control of the infant issue of the marriage, Desiree (child No. 1) and Douglas (child No. 2). On all the credible evidence heard in this matter, the taking of the children from their mother was without her consent, unlawful and accompanied by the use of force and unsupported by any court order, decree or edict. Nor were the provisions of the Family Court Act (§§ 331, 332, 333, 335,, 336, 337, 321-325) carried out. The fact-finding hearing did not produce a preponderance of any credible evidence to show that the best interest of the children would be served by taking them away from their mother and lawful custodian. Children such as here, ages three and one, respectively, belong with their mother and the totality and preponderance of credible evidence in this case does not show that the welfare of such children will suffer in her custody.
As to the petition for support, order of support is granted to petitioner for the support of two children in amount of $50 per week. This order is based on all credible evidence in this case and a preponderance thereof and the finding is on a means basis. Respondent husband is now earning $456 gross monthly, or approximately $100-$110 per week, net. Respondent lives at *37 home with his parents. Petitioner is presently unemployed and on supplemental public assistance. Petitioner states she may seek employment, but if so expenses for baby sitter are indicated. Provision for support in separation decree amended accordingly. Visitation rights are allowed to respondent, away from premises on Sundays from 11:00 a.m.-6 :00 p.m. Respondent is to call for children at designated hour, at which time petitioner is to have children dressed and ready. Children are to be returned promptly by respondent to petitioner at 6:00 p.m. In event children are sick, petitioner is to give respondent at least 24 hours’ notice, unless sickness is sudden, grave and of emergency nature, immediately prior to beginning of visitation rights. Respondent husband is to notify petitioner 24 hours in advance if he is not able to exercise visitation rights. Other visitation rights set forth in paragraph 13 of separation agreement as to week-end visits and vacation are canceled.
In view of bitter acrimony between the parties and their families, and the harassments and threats that have already gone on, temporary mutual orders of protection granted June 25,1970 are finalized as amended, in accordance with above provisions. Neither party is to strike, threaten, annoy, molest, or assault, or harass the other, or members of their respective’ families; nor is either party to telephone the other except for purposes concerning visitation or illness.
■In connection with these decisions and orders, parties and their attorneys are to be notified. The attorney for the petitioner in the writ of habeas corpus petition is to submit order on notice.